ANNETTE L. HURST (BAR NO. 148738)
ahurst@orrick.com
DIANA M. RUTOWSKI (BAR NO. 233878)
drutowski@orrick.com
DANIEL D. JUSTICE (BAR NO. 291907)
djustice@orrick.com
ANA M. MENDEZ-VILLAMIL (BAR NO. 344768)
amendez-villamil@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

LAURA A. WYTSMA (BAR NO. 189527)
lawytsma@orrick.com
ISAAC BEHNAWA (BAR NO. 342441)
ibehnawa@orrick.com
355 S. Grand Street, # 2700
Los Angeles, CA 90071
Telephone: +1 213 629-2020
Facsimile: +1 213 612 2499

Attorneys for Plaintiff
SONY INTERACTIVE ENTERTAINMENT LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONY INTERACTIVE ENTERTAINMENT LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>TENCENT HOLDINGS LTD., a Cayman Islands corporation; TENCENT TECHNOLOGY (SHANGHAI) COMPANY LTD. d/b/a AURORA STUDIOS and/or POLARIS QUEST, a Chinese company; TENCENT AMERICA LLC, a Delaware limited liability company; PROXIMA BETA PTE LTD. d/b/a TENCENT GAMES and/or LEVEL INFINITE, a Singapore corporation; PROXIMA BETA U.S. LLC, a Delaware limited liability company; and DOES 1-10.<br><br>Defendants. | Case No. 3:25-cv-06275-JSC<br><br>**PLAINTIFF SONY INTERACTIVE ENTERTAINMENT LLC'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: December 2, 2025<br>Time: 9:00 a.m.<br>Courtroom: 8 – 19th Floor<br>Judge: Hon. Jacqueline Scott Corley |

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ................................................. 2

FACTUAL BACKGROUND .............................................................................. 3

    A.    SIE Invests Substantially in Creating Highly Expressive Content and a Protectable Character Mark. ..................................................... 3

    B.    Defendants' Unauthorized Use of the *Horizon* Franchise Intellectual Property .................................................................................. 4

    C.    Tencent Holdings Is at the Helm, Globally Directing the Business That Developed and Promotes the Infringing *Light of Motiram* Game. ......... 5

ARGUMENT ....................................................................................................... 8

I.    SIE'S CLAIMS ARE RIPE FOR ADJUDICATION. ........................................ 8

II.    SIE'S ALLEGATIONS ESTABLISH COGNIZABLE CLAIMS FOR COPYRIGHT AND TRADEMARK INFRINGEMENT AGAINST ALL DEFENDANTS. .................. 10

    A.    SIE Sufficiently Alleges Copyright Infringement Against All Defendants........... 11

        1.    SIE Sufficiently Alleges Copyright Infringement by All Defendants. ...... 12

        2.    SIE Sufficiently Alleges Copyright Infringement in The United States.... 15

    B.    SIE Sufficiently Alleges Trademark Infringement by All Defendants.................. 16

        1.    SIE Sufficiently Alleges the ALOY Character Mark Is Protectable.......... 17

        2.    SIE Sufficiently Alleges That Tencent's Use of a Lookalike ALOY Character Mark Is Likely to Cause Consumer Confusion. ....................... 18

        3.    Tencent's Arguments Fail To Establish Any Pleading Defect. ................. 21

III.    THIS COURT HAS PERSONAL JURISDICTION OVER TENCENT HOLDINGS. ..... 25

    A.    Tencent Holdings Purposefully Directed Infringing Activities at the Forum and Its Residents....................................................................... 27

        1.    Tencent Holdings Committed Intentional Acts Expressly Aimed at California and the United States.............................................. 27

        2.    Tencent Holdings Caused Harm It Knew Would be Suffered in California and the United States. ............................................. 31

    B.    SIE's Claims Arise Out of and are Related to Tencent Holdings' Forum-Related Activities .................................................................. 32

    C.    Tencent Holdings Cannot Show That Exercising Personal Jurisdiction Would Be Unreasonable or Unfair....................................................... 33

CONCLUSION .................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*24/7 Customer, Inc. v. 24-7 Intouch*,
5
    2015 WL 1522236 (N.D. Cal. Mar. 31, 2015) ................................................................. 18, 19

6
*3DO Co. v. Poptop Software, Inc.*,
    1998 WL 962202 (N.D. Cal. Oct. 27, 1998) ........................................................................ 32
7

*Activision Publ'g, Inc. v. EngineOwning UG*,
8
    2023 WL 3272399 (C.D. Cal. Apr. 4, 2023) ....................................................................... 33

9
*Addington v. U.S. Airline Pilots Ass'n*,
    606 F.3d 1174 (9th Cir. 2010) ................................................................................................ 9
10

*Adobe Sys. Inc. v. Blue Source Grp., Inc.*,
11
    125 F. Supp. 3d 945 (N.D. Cal. 2015) ...................................................................... 13, 25, 32

12
*Advanta-STAR Auto. Rsch. Corp. of Am. v. Search Optics, LLC*,
13
    672 F. Supp. 3d 1035 (S.D. Cal. 2023) ............................................................................... 14

14
*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ............................................................................................................... 10
15

*AMF Inc. v. Sleekcraft Boats*,
16
    599 F.2d 341 (9th Cir. 1979) .......................................................................................... 18, 19

17
*Arista Recs., LLC v. Doe 3*,
18
    604 F.3d 110 (2d Cir. 2010) ................................................................................................. 11

19
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................. 11
20

*Ayla, LLC v. Alya Skin Pty. Ltd.*,
21
    11 F.4th 972 (9th Cir. 2021) ................................................................................................ 32

22
*Ballard v. Savage*,
23
    65 F.3d 1495 (9th Cir. 1995) ............................................................................................... 26

24
*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................. 10
25

26
*Bhatia v. Silvergate Bank*,
    725 F. Supp. 3d 1079 (S.D. Cal. 2024) ............................................................................... 13

27
*Bolling v. Mercedes-Benz USA, LLC*,
28
    2025 WL 83826 (N.D. Ga. Jan. 10, 2025) .......................................................................... 13

*Briskin v. Shopify, Inc.*,
    135 F.4th 739 (9th Cir. 2025) (en banc)................................................. 25, 26, 27, 28

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462, 477 (1985) ................................................................................ 26

*BuzzBallz, L.L.C. v. BuzzBox Beverages, Inc.*,
    2016 WL 7496769 (C.D. Cal. Apr. 12, 2016). ............................................... 24

*Church & Dwight Co., Inc. v. Mayer Lab., Inc.*,
    2012 WL 1225912 (N.D. Cal. Apr. 1, 2011) .................................................. 19

*Coach, Inc. v. Celo Customs Servs. Co.*,
    2012 WL 12883972 (C.D. Cal. Oct. 31, 2012) ............................................... 22

*DC Comics, Inc. v. Filmation Assocs.*,
    486 F. Supp. 1273 (S.D.N.Y. 1980) ............................................................... 17

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) ........................................................................ 21

*Dfinity Found. v. Meta Platforms, Inc.*,
    2022 WL 16857036 (N.D. Cal. Nov. 10, 2022)............................................... 24

*Doe v. Unocal Corp.*,
    248 F.3d 915 (9th Cir. 2001)........................................................................... 30

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997) ........................................................................ 17

*Formal Ent. LLC v. Malik*,
    2024 WL 4404426 (C.D. Cal. May 30, 2024) ................................................ 13

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025) ........................................................................................... 26

*Gauvin v. Trombatore*,
    682 F. Supp. 1067 (N.D. Cal. 1988) .............................................................. 14

*Gen-Probe, Inc. v. Amoco Corp.*,
    926 F. Supp. 948 (S.D. Cal. 1996) ................................................................. 14

*Goes Int'l, AB v. Dodur Ltd.*,
    2015 WL 5043296 (N.D. Cal. Aug. 26, 2015)........................................... 29, 31

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000)......................................................................... 21

*Hana Fin., Inc. v. Hana Bank*,
    574 U.S. 418 (2015) ....................................................................................... 21

*Hanagami v. Epic Games, Inc.*,
   85 F.4th 931 (9th Cir. 2023) ......................................................................... 11

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
   328 F.3d 1122 (9th Cir. 2003) ....................................................................... 35

*Heller v. NBCUniversal, Inc.*,
   2016 WL 6573985 (C.D. Cal. Mar. 30, 2016) ............................................... 13

*Hernandez v. City of San Jose*,
   897 F.3d 1125 (9th Cir. 2018) ....................................................................... 10

*In re Hydroxycut Mktg. & Sales Pracs. Litig.*,
   810 F. Supp. 2d 1100 (S.D. Cal. 2011) ......................................................... 30

*In re iPhone Application Litig.*,
   2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ............................................. 14

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2008) ......................................................................... 17

*Ketab Corp. v. Mesriani & Assocs., P.C.*,
   734 F. App'x 401, 406 (9th Cir. 2018) .......................................................... 22

*Lang Van, Inc. v. VNG Corp.*,
   40 F.4th 1034 (9th Cir. 2022) ........................................................... 27, 33, 34

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ....................................................................... 26

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) ................................................................. 31, 32

*Microsoft Corp. v. Very Competitive Comput. Prods. Corp.*,
   671 F. Supp. 1250 (N.D. Cal. 1987) ............................................................. 35

*Pac. Bell Tel. Co. v. 88 Connection Corp.*,
   2016 WL 3257656 (N.D. Cal. June 14, 2016) ............................................... 31

*In re Packaged Seafood Prods. Antitrust Litig.*,
   338 F. Supp. 3d 1118 (S.D. Cal. 2018) ......................................................... 30

*Panavision Int'l, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998) ................................................................. 32, 34

*Paramount Pictures Corp. v. Axanar Prods., Inc.*,
   2016 WL 2967959 (C.D. Cal. May 9, 2016) ................................................... 9

*Pom Wonderful LLC v. Hubbard*,
   775 F.3d 1118 (9th Cir. 2014) ....................................................................... 17

iv

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015)................................................................................ 26

*Riot Games, Inc. v. Suga PTE, LTD.*,
    638 F. Supp. 3d 1102 (C.D. Cal. 2022)................................................. 32, 34, 35

*Roth v. Garcia Marquez*,
    942 F.2d 617 (9th Cir. 1991)................................................................................ 34

*Sandoval v. Ali*,
    34 F. Supp. 3d 1031 (N.D. Cal. 2014) ................................................................ 30

*Schlegel v. Wells Fargo Bank, NA*,
    720 F.3d 1204 (9th Cir. 2013).............................................................................. 10

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004)..........................................................................*passim*

*Sony Pictures Ent., Inc. v. Fireworks Ent. Grp.*,
    137 F. Supp. 2d 1177, 1196 (C.D. Cal. 2001)................................................... 22

*Soo Park v. Thompson*,
    851 F.3d 910 (9th Cir. 2017)................................................................................ 11

*In re Stallard*,
    2023 WL 5607600 (TTAB Aug. 28, 2023)................................................... 20, 23

*Steward v. West*,
    2013 WL 12120232 (C.D. Cal. Sept. 6, 2013).................................................. 14

*Stewart v. Screen Gems-EMI Music, Inc.*,
    81 F. Supp. 3d 938 (N.D. Cal. 2015) .................................................................. 30

*T Niantic, Inc. v. Global++*,
    2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ................................................. 13

*Tivoli LLC v. Sankey*,
    2015 WL 12683801 (C.D. Cal. Feb. 3, 2015).............................................. 13, 14

*United Pub. Workers v. Mitchell*,
    330 U.S. 75 (1947)................................................................................................... 9

*Universal City Studios, Inc. v. J.A.R. Sales, Inc.*,
    1982 WL 1279 (C.D. Cal. Oct. 20, 1982)........................................................... 17

*Visual Changes Skin Care Int'l, Inc. v. Neways, Inc.*,
    2008 WL 4723603 (E.D. Cal. Oct. 24, 2008)..................................................... 19

*Wargaming.Net Ltd. v. Blitzteam LLC*,
    2021 WL 3619956 (C.D. Cal. Jan. 20, 2021) ............................................... 32, 34

*Warner Bros. Ent., Inc. v. X One X Prods.*,
    840 F.3d 971 (8th Cir. 2016) .................................................................................... 18

*Warner Bros. Ent. v. Glob. Asylum, Inc.*,
    2013 WL 12114836 (C.D. Cal. Jan. 29, 2013) ........................................................ 9

*Will Co., Ltd. v. Lee*,
    47 F.4th 917 (9th Cir. 2022) ............................................................................ 29, 31

*Williams v. Yamaha Motor Co. Ltd.*,
    851 F.3d 1015 (9th Cir. 2017) ................................................................................ 30

*Wolfe v. Strankman*,
    392 F.3d 358 (9th Cir. 2004) .................................................................................... 9

*Woodall v. Walt Disney Co.*,
    2021 WL 4442410 (C.D. Cal. Aug. 5, 2021) ......................................................... 13

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
    601 F. Supp. 3d 625 (C.D. Cal. 2022) .................................................................... 34

**Statutes**

Cal Civ. Proc. Code § 410.10 ......................................................................................... 25

**Other Authorities**

Fed. R. Civ. P. 4(k)(1) .................................................................................................... 25

Fed. R. Civ. P. 4(k)(2) ................................................................................. 25, 26, 27, 33

Fed. R. Civ. P. 8 ..................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 10

McCarthy on Trademarks and Unfair Competition § 4.2 (5th ed. May 2025 update)................. 17

3 J. McCarthy, Trademarks and Unfair Competition § 17:26, (4th ed. 2014) ............................ 21

1

**INTRODUCTION**

2        In 2017, Plaintiff Sony Interactive Entertainment LLC ("SIE") introduced one of the most

3    successful video games in the company's history: *Horizon Zero Dawn*. That initial game reflected

4    the extraordinary investment of an entire studio dedicated to its six-year development and led to a

5    critically acclaimed and wildly popular *Horizon* Franchise that continues to expand. Seeking to

6    piggyback off this success, Defendants—members of the Tencent conglomerate of companies that

7    refers to itself as "Tencent"— sought to develop a *Horizon* spin-off and asked SIE for a license to

8    do so. Executives of Tencent pitched a *Horizon* spin-off here, in San Francisco, California, at a

9    game developer conference. When SIE declined Tencent's pitch, Tencent pushed forward anyway.

10        Tencent copied *Horizon*'s look, sound, characters, and narrative. It then promoted the

11    knock-off *Light of Motiram* under a trademark and on a website registered to the mothership,

12    Tencent Holdings Ltd. ("Tencent Holdings"). *Light of Motiram*—a knock-off game so blatant that

13    the public loudly decried the obvious and pervasive copying of *Horizon*'s protected elements—

14    jeopardizes *Horizon*'s continued success, including current expansion plans for the franchise.

15        Although the public expressed confusion and outrage upon discovering *Light of Motiram*

16    for the knock-off that it is, Tencent remained undeterred. Tencent continued promoting its

17    infringing game over SIE's objection, and Tencent refused to accept any responsibility over its

18    conduct. After SIE was forced to sue, Tencent attempted to avoid liability by playing a shell game

19    with its brands and entities. Tencent tried to shield Defendants that it owns and/or controls from

20    service of process and now seeks to escape jurisdiction over the parent entity, Tencent Holdings.

21        Tencent now advances three arguments for dismissal, which all fail. First, Tencent

22    remarkably contends SIE's claims are unripe because—despite having announced and continuously

23    promoted its game for *months*—Tencent (purportedly) delayed *Light of Motiram*'s release until

24    2027 *after* SIE sued. This is nonsense. The damage is done—and it continues. SIE has already

25    suffered injury by Tencent promoting its knock-off game, as made clear by the many instances of

26    actual consumer confusion documented in the Complaint that Tencent does not—and cannot—

27    challenge in its motion. The Court can redress past, ongoing, and imminent infringement.

28

Second, Tencent argues that SIE's detailed allegations provide inadequate notice of individual Defendants' wrongdoing because SIE pled some allegations against members of the Tencent conglomerate collectively. Courts routinely reject such challenges at the pleading stage. *See infra* II.A.1. Tencent Holdings and the entities it owns and/or controls have engaged in conduct that infringes SIE's intellectual property. It is Tencent's own business model—obfuscating the role of all divisions and business units under the "Tencent" banner—that makes SIE's so-called "group" allegations entirely appropriate at the pleading stage before any discovery has occurred.

Third, the Cayman Islands-registered mothership Tencent Holdings argues that it should not have to defend itself here in the United States. But this Court has jurisdiction over Tencent Holdings. The multi-billion dollar global conglomerate holds the U.S. trademark registration for the infringing game *Light of Motiram* and owns the domain registration for the official promotional website <www.LightofMotiram.com> where much of the material giving rise to this lawsuit was performed and distributed to a California and U.S. audience. Tencent Holdings also holds itself out as operating "Tencent Games" as a division, recognizes all revenue from its gaming business, and informed this Court in litigation that it promotes services and goods (including games) in the United States. It is not a mere holding company. Tencent Holdings cannot show why exercising jurisdiction here would be unreasonable or unfair.

On all points, Tencent's motion is meritless and should be denied.

### STATEMENT OF ISSUES TO BE DECIDED

1.    Does Tencent's post-Complaint unilateral non-binding release date announcement strip this Court of subject matter jurisdiction to adjudicate claims of past and ongoing infringement?

2.    Where SIE's Complaint alleges facts supporting all the elements of its copyright and trademark claims against a group of corporate affiliates whose precise roles in the infringements are not publicly known, has SIE provided sufficient notice under Rule 8's liberal pleading standard?

3.    Does it offend due process for the Court to exercise specific personal jurisdiction over Tencent Holdings given the evidence that it (i) promoted the infringing game in this District under Tencent-owned brands; (ii) holds the US trademark registration for the infringing game; (iii) owns the domain registration for the infringing game's official website; (iv) operates "Tencent

Games" as a division; (v) recognizes all revenue from its gaming business; and (vi) informed this Court in seeking judicial relief that it promotes services and goods (including games) in the United States and has an "office" in this District?

## **FACTUAL BACKGROUND**

### A.    SIE Invests Substantially in Creating Highly Expressive Content and a Protectable Character Mark.

After six years of development and substantial investments of time and resources, SIE released a live-action, open-world, third-person perspective role-playing game called *Horizon Zero Dawn*. Compl. ¶ 44. In the game, players explore a post-apocalyptic world filled with lush biomes ranging from rich forests to broad deserts to frozen mountain ranges that have reclaimed the ruins of a lost high-tech human world. *Id.* ¶ 50. The world is inhabited by the last remnants of human civilization who live in distinct tribes, each with its own carefully crafted look and unique culture. *Id.* ¶¶ 53-54. The tribes share the world with hostile animal-like robots called "Machines" who roam the planet and perform unique terraforming functions. *Id.* ¶ 51. The central protagonist of *Horizon* is "Aloy," a unique and dynamic heroine characterized by red hair and tribal attire that marries traditional and industrial elements. *Id.* ¶¶ 112-13.

Upon release, *Horizon Zero Dawn* quickly became a blockbuster. *Id.* ¶¶ 60-62. Video game publications touted its "truly new" and "genre-blending world," "blend[ing] futuristic elements with primitive ones to produce a unique new aesthetic." *Id.* ¶ 60 & n.15-16. It won numerous awards, including "Best Original Game" and quickly grew a fan base in the tens of millions. *Id.* ¶¶ 61-62. *Horizon Zero Dawn*'s success spawned a series of *Horizon* games and other related *Horizon* products and merchandise known as the "*Horizon* Franchise." *Id.* ¶¶ 2, 44-46.

The protagonist Aloy has become the face of the *Horizon* Franchise and a widely recognized symbol of SIE more broadly. *Id.* ¶ 118. The *Horizon* Franchise earned public recognition for its original and distinctive characterization of Aloy, and commentators have noted that "her face is recognizable to almost everyone in the PlayStation community." *Id.* ¶ 97 & n. 30. SIE has used Aloy's image as a trademark (the "ALOY Character Mark") continuously and prominently since at least February 2017 as a source-identifying brand for the *Horizon* Franchise, including in the

*Horizon* videogames, packaging, digital store banners, marketing, social media avatars, trailers, and merchandise. *Id.* ¶¶ 48, 114-15. SIE's branded merchandise featuring the ALOY Character Mark includes apparel, board games, action figures, plush toys, apparel, ornaments and figurines, costumes, mugs, art prints, jewelry, and a variety of other items. *Id.* ¶¶ 4, 63. SIE has also promoted its ALOY Character Mark with high-profile global marketing campaigns, cross-brand collaborations, and pervasive press coverage, such that consumers and media outlets frequently refer to Aloy as an SIE brand. *Id.* ¶¶ 118-19.

**B.    Defendants' Unauthorized Use of the *Horizon* Franchise Intellectual Property**

Motivated by *Horizon*'s "[h]igh IP value" and "international acclaim," Tencent started developing a *Horizon* spin-off game. *Id.* at ¶ 67. Recognizing it needed a license, Tencent sought one from SIE at a gaming conference in San Francisco, California, in March 2024. *Id.* at ¶ 65. At the conference, "Tencent Games" executives presented SIE with an "IP Crossover" proposal to create a game set in the *Horizon* universe. *See* Declaration of Olivier Courtemanche Ex. A at 2; *see also* Compl. ¶¶ 65-69.[1] In this proposal of "Aurora A Tencent Games Studio," Tencent explained that the development team of Aurora Studios—part of Tencent Holdings—included "[d]ie-hard fans" of *Horizon*. Courtemanche Decl. Ex. A; Compl. ¶ 66; Hurst Decl. Ex. 8 at 7. SIE declined Tencent's proposal. Courtemanche Decl. Ex. B; Compl. ¶ 70.

Nonetheless, Tencent proceeded with its plan. In late 2024, Tencent, via social media platforms and Tencent Holdings' lightofmotiram.com website, announced the release of an open-world survival game entitled *Light of Motiram* with striking resemblance to *Horizon*. Compl. ¶¶ 71-72. Tencent released promotional materials directed at a U.S. audience including gameplay trailers, screenshots, and images across Steam, Facebook, Instagram, X, Discord, YouTube, and Reddit. *Id.* ¶¶ 7, 72-73, 76, 114, 121, 138; Hurst Decl. ¶ 2, 24.A-38. The promotional materials appear substantially similar to video, audio, and narrative content from the *Horizon* franchise. Like *Horizon*, they depict a lush natural post-apocalyptical landscape mirroring SIE's unique expression of *Horizon*'s rich biomes. Compl. ¶¶ 89-91. The world is also populated with culturally distinct

---

[1] As discussed (at 26), the Court properly considers evidence outside the pleadings for purposes of Tencent's factual challenge to personal jurisdiction.

tribes of surviving humans as well as "Mechanimals" that mirror *Horizon*'s Machines. *Id.* ¶¶ 94-95, 106-11. *Light of Motiram* even features an Aloy doppelganger as its face. *Id.* ¶¶ 120-27. The copying was so egregious that numerous journalists and *Horizon* fans called *Light of Motiram* "a major *Horizon* rip off," "an obvious knock off," a "copycat" with a main character that "resembles Aloy to a tee," and "extremely similar to *Horizon Zero Dawn*." *Id.* ¶ 80 & fn. 37.

### C.    Tencent Holdings Is at the Helm, Globally Directing the Business That Developed and Promotes the Infringing *Light of Motiram* Game.

As alleged in the Complaint, the "corporate structure, ownership percentages, and affiliations of the entities associated with the *Light of Motiram* game are deliberately opaque to the public." *Id.* ¶ 33. However, Tencent's own public documents show the following facts.

**Tencent Holdings Is a Billion-Dollar Technology Conglomerate Operating a Global Gaming Business:** Tencent Holdings is a multinational technology conglomerate based in China and incorporated in the Cayman Islands. Hurst Decl. Ex. 1 (Tencent Holdings 2025 Interim Report) at 34. Although describing itself in an attorney declaration as no more than a "holding" company, (Dkt. 48-1), it is far from that. Tencent Holdings claims that its "Games" business is "#1 by revenue" globally. *Id.* Ex. 2 at 5 (2025 Second Quarter Results Presentation). Tencent Holdings' "Games" business generated approximately 30% of its 660.2 billion Chinese yuan or $92.7 billion in 2024 revenue and "International Games" alone generated over $8 billion. *Id.* Ex. 2 at 7 (Tencent Holdings Limited 2025 Q2 Results Presentation). Globally, Tencent Holdings operates under the generic brand "Tencent," without distinguishing between formal and informal corporate structures in shareholder disclosures, public promotion, and branding. *See*, *e.g.*, *id.* Exs. 1-4. Tencent Holdings recognizes all revenue from its operations, including its gaming business. *Id.* Ex. 3 at 4-5, 8-9, 12-13, 16 (Tencent Holdings Limited 2024 Annual Report).

**Through Its Interactive Entertainment Line of Business, Tencent Holdings Controls "Tencent Games" and Tencent-"Owned" Studios**: Tencent Holdings operates through six divisions or groups, including an Interactive Entertainment Group ("IEG") that it holds out as part of Tencent Holdings. Hurst Decl. Ex. 4 ("Tencent Holdings" "Corporate Overview"); *see id.* Exs. 5, 7 (establishing that the Tencent.com website is published by Tencent Holdings). Tencent

1    Holdings' webpage describes Tencent IEG as "[r]esponsible for the R&D, operation, and

2    development of the company's interactive entertainment business including games." *Id.* Ex. 4

3    (Tencent.com "About Us" page); *see also id.* Ex. 9 (About Tencent Games) ("With the adjustment

4    of Tencent's organizational structure, Tencent Games became an important business section of the

5    interactive entertainment business group."). Tencent Holdings describes its "#1 by revenue

6    globally" "Games" division as one of its "Key Services." *Id.* Ex. 2 at 5 (2025 Second Quarter

7    Results Presentation).

8         The Games division operates world-wide, with Tencent Holdings' website listing a senior

9    executive Ma Xiaoyi as "responsible for international publishing of Tencent Games." *Id.* Ex 3

10   (Tencent 2024 Annual Report) at 64. Tencent Holdings advertises that its Tencent Games

11   "publishes some of the world's most popular video games … around the globe." *Id.* Ex. 4

12   (Tencent.com "About Us"). And Tencent Holdings has represented in litigation that it "has tens of

13   thousands of employees in various countries, with an office in Palo Alto, California." *See id.* Ex. 6

14   ¶ 10; *see also* Ex. 4 (Tencent.com "Our Offices" page indicating the company has offices in Los

15   Angeles, Palo Alto, and Irvine); *id.* Ex. 16 (describing "Tencent America" as the "U.S. branch" of

16   Tencent, headquartered in Palo Alto, California).

17        Tencent Holdings' IEG group has four "in-house" studio groups: TiMi Studio Group,

18   Lightspeed Studios, Aurora Studio, Morefun Studio. *Id.* Ex. 9 (TencentGames.com/about.html).

19   Tencent Holding's shareholder Corporate Overview describes these studios as "Owned Studios."

20   *Id.* Ex. 8 at 7. Tencent Holdings owns U.S. trademark registrations for both TENCENT GAMES

21   and AURORA STUDIOS. *Id.* Exs. 10, 11. Tencent Games describes its "in house" Aurora Studios

22   as a "self-development large-scale studio[] founded by Tencent." *Id.*; *id.* Ex. 9

23   (TencentGames.com/about.html). And when pitching SIE for the *Horizon* "IP Crossover" in San

24   Francisco, representatives of "Tencent Games" presented "Aurora Studio Group" as "One of IEG's

25   four game studios." Courtemanche Ex. A; Compl. ¶¶ 65-68.

26        Tencent Holdings also involves subsidiaries in its games business—shifting brand names

27   and operations across its entities to suit its purposes. At times, Tencent Holdings uses subsidiary

28   Proxima Beta PTE Ltd. to market games globally. *See* Compl. ¶¶ 27-30. Proxima Beta has been

described as a subsidiary or controlled by Tencent Holdings, and as part of the "Tencent group of companies." Hurst Decl. Ex. 14 ¶ 9; Ex. 15 at 5; Ex. 22. Tencent Holdings also uses Tencent America to conduct certain business in the United States. Compl. ¶¶ 23-26. Brent Irvin, the Vice-President and General Counsel of Tencent Holdings, *is also the President of Tencent Americas*. Hurst Decl. ¶ 4 & Ex. 23.[2]

**Tencent Holdings Owns Registrations for *Light of Motiram*'s Website Domain and Trademark:** Tencent Holdings not only owns and directs Tencent's global gaming business generally through its IEG, it is directly involved with *Light of Motiram. See* Compl. ¶¶ 18-19. In March 2023, Tencent Holdings acquired the *Lightofmotiram.com* domain name using a United States registrar, Mark Monitor, with a Kentucky address. Hurst Decl. Ex. 12. Several months later, in September 2023, Tencent Holdings applied to register the U.S. trademark LIGHT OF MOTIRAM, declaring a bona fide intention to use that mark in commerce in the United States in connection with "software for playing computer and video games and the provision of entertainment services and competitions relating to video games." *Id.* ¶ 46 & Ex. 39. The registration issued in July 2024. U.S. Trademark No. 7,434,160. Hurst Decl. ¶ 47 & Ex. 40.

Tencent Holdings does not just hold trademarks for a "sole[ly] administrative purpose" as the company's attorney-declarant asserts. Dkt. 48-1 ¶ 5. Rather, in a prior trademark litigation, Tencent Holdings (as the sole plaintiff) represented in this Court that *Tencent Holdings* "promote[s] goods and services under a series of TENCENT-related trademarks, including TENCENT [and] TENCENT GAMES." Hurst Decl. Ex. 6 ¶ 11. As Tencent Holdings then averred, since its founding in 1998, Tencent Holdings "has provided a number of Internet, social media, e-commerce, messaging, *gaming and mobile services to users* in China and other countries, *including the United States*. *Id.* ¶ 9 (emphasis added). Tencent Holdings' "best known goods and services enable users to … *access online games* and entertainment" and "*[m]any Chinese Americans use Tencent's goods and services for* messaging, social networking and *gaming*." *Id.* ¶¶ 12, 17 (emphasis added).

---

[2] Though Tencent argues that two remaining foreign Defendants have not yet been served (Mot. 2), SIE is continuing to investigate whether service efforts already completed or other alternate means may be effective on those Defendants.

**Tencent Holdings Promotes Its Games—and Pitches *Light of Motiram*—Here in California**: One of the "biggest" priorities of Tencent Holdings is reaching a global audience for Tencent's games through overseas promotion. Courtemanche Decl. Ex. A, at 10. Tencent executives emphasized this in their presentation to SIE for an "IP Crossover," quoting Tencent Holdings CEO and Chairman Pony Ma: "Promoting games overseas is Tencent's biggest priority for internationalization at present." *Id.*; Hurst Decl. Ex. 1, at 7. Consistent with this prioritization of its international games business, employees of Tencent Holdings' gaming business are based in the United States and California. *See, e.g.*, *id.* Ex. 13.

Tencent Holdings not only generally promotes its gaming business throughout the United States (including California), but it promoted the development of *Light of Motiram*—and tried to secure a license for *Horizon*'s intellectual property to produce the game—right here in San Francisco, California, a mere mile from this Court at the Moscone Center during the annual Game Developer's Conference in March 2024. *Supra* 4 (discussing executives for "Tencent Games" presenting a pitch for "Aurora Studio Group," "[o]ne of [Tencent] IEG's four game studios"). When SIE declined the request for a license, the Tencent executives, including ones based in California, continued directing communications to California-based SIE employees about the desire to develop a *Horizon*-themed game. Courtemanche Decl. Ex. B; Hurst Decl. Ex. 13. SIE again made clear it would not license the *Horizon* IP, which the Tencent executives acknowledged, and at least implied they were shifting gears ceasing development. Courtemanche Ex. B, at 2. Nevertheless, "Tencent Holdings' executives made the decision to continue pursuing development of the game for publication and distribution in the United States." Compl. ¶ 19. Tencent began promoting the knock-off on its website and U.S.-based social media sites, such as Discord, Steam, X, Instagram and Facebook. *See* Compl. ¶¶ 7, 72-76, 114, 121, 138.

## ARGUMENT

## I.    SIE'S CLAIMS ARE RIPE FOR ADJUDICATION.

Despite having *already* extensively and repeatedly released *Light of Motiram* promotional materials, trailers, and gameplay that infringe SIE's copyrights and ALOY Character Mark, Tencent argues that there is no ripe controversy before this Court. Mot. 30-32. Tencent urges the

1    Court to improperly take judicial notice of a unilateral change to the advertised release date on

2    *Light of Motiram* Steam and Epic Games distribution platforms from a "coming soon" release to a

3    purported fourth quarter of 2027 release and conclude the change made this case premature for

4    adjudication. *Id.*; Hurst Decl. ¶¶ 2-3. This argument is equally far-fetched and wrong.

5        A case is ripe when it presents "concrete legal issues, presented in actual cases, not

6    abstractions." *United Pub. Workers v. Mitchell*, 330 U.S. 75, 89 (1947). Here, there is a clear, actual,

7    and concrete dispute. Tencent mounts a "facial challenge" to the Court's subject matter jurisdiction

8    under which the Court must "assume [the plaintiff's] allegations to be true and draw[s] all

9    reasonable inferences in [its] favor." *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). That

10   requirement alone is fatal because Tencent does not contest, and thus has forfeited any challenge

11   to, the Complaint's many allegations that Tencent has already infringed and thus has already injured

12   SIE. Specifically, SIE's first claim for relief alleges that Tencent *already* infringed by "distributing

13   copies of promotional materials for Light of Motiram" and "[p]ublicly performing *Light of*

14   *Motiram*" that "contain[] copyrighted elements of the *Horizon* Franchise." Compl. ¶ 130. SIE's

15   trademark claims likewise allege that Tencent has *already* "adopted and used a red-haired tribal

16   huntress image, the Aloy lookalike, as a brand identifier for Light of Motiram" across Steam

17   banners, website mastheads, social-media avatars, app-store icons, and trailer stills. *Id.* ¶ 138.

18   Specifically pled factual allegations support these claims. *Id.* ¶¶ 11-12, 71–73, 76–79, 138.

19       Further, although the aforementioned allegations establish a concrete case or controversy,

20   "[a] litigant need not 'await the consummation of threatened injury to obtain preventive relief. If

21   the injury is certainly impending, that is enough.'" *Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d

22   1174, 1179 (9th Cir. 2010). Tencent's purported evidence of a delayed release date in a request for

23   judicial notice makes no difference. Such evidence is not properly considered. *See* Opp. to Req. for

24   Judicial Notice. And it would be immaterial in any event because Tencent has and *still is* publicly

25   announcing plans to release the game before this lawsuit is expected to be resolved. At the pleading

26   stage, it is sufficient that a defendant has released "a completed scene" of an impending release for

27   the Court to analyze infringement. *Paramount Pictures Corp. v. Axanar Prods., Inc.*, 2016 WL

28   2967959, at *6 (C.D. Cal. May 9, 2016) (finding ripe controversy); *see also Warner Bros. Ent. v.*

*Glob. Asylum, Inc.*, 2013 WL 12114836, at *15 (C.D. Cal. Jan. 29, 2013), *aff'd sub nom. Warner Bros. Ent. v. Glob. Asylum, Inc.,* 544 F. App'x 683 (9th Cir. 2013) (enjoining unreleased film and finding likely Lanham Act violation based on marketing and impending distribution).[3]

Here, Tencent has advertised gameplay from *Light of Motiram* that infringes SIE's intellectual property. Compl. ¶¶ 7-10, 68-71. Tencent is planning imminent U.S. beta testing followed by a U.S. release, *id.* ¶¶ 74, all involving use of an Aloy lookalike as a brand identifier across storefront and social channels, *id.* ¶ 138. Further, Tencent Holdings filed a U.S. trademark application for LIGHT OF MOTIRAM, declaring its bona fide intention to use the name in connection with the game in the U.S. *Id.* ¶ 18. Notably, Tencent elected not to dispute any of these facts or that still intends to release *Light of Motiram*—the post-lawsuit delayed release is just a tactical measure to conjure inapplicable legal arguments about ripeness and injury.

Tencent's conduct has already significantly harmed—and continues to harm—SIE as well as the public by the consumer confusion Tencent has caused. Compl. ¶¶ 11, 79, 126. Tencent's suggestion that the harm caused by *Light of Motiram*'s ongoing promotion cannot be fully remedied until Tencent further compounds that harm by releasing the completed game is unsupported by the caselaw or logic. SIE's claims can and should be adjudicated now.[4]

## II. SIE'S ALLEGATIONS ESTABLISH COGNIZABLE CLAIMS FOR COPYRIGHT AND TRADEMARK INFRINGEMENT AGAINST ALL DEFENDANTS.

Tencent's effort to short-circuit this case at the pleading stage fares no better. Mot. 19-30. On a motion to dismiss, a district court must accept all well-pled allegations in the complaint as true and draw all inferences in the non-moving party's favor. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018); *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1207 (9th Cir. 2013). A complaint will survive a Rule 12(b)(6) motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[3] The cases Tencent cites (at 31-32) are all inapposite because none involved already released infringing promotional material, let alone excerpts showing the to-be-released infringing work.

[4] Tencent has not argued that this case is moot. Nor could it in light of the past harm and its failure to make "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff may satisfy this standard by pleading facts alleged upon information and belief where the facts are "peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("[W]e relax pleading requirements where the relevant facts are known only to the defendant."); *see also Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (allegations made on information and belief sufficiently alleged claim for copyright infringement). SIE's claims for copyright and trademark infringement easily clear this low bar.

## A.    SIE Sufficiently Alleges Copyright Infringement Against All Defendants.

To state a claim for copyright infringement, SIE must plead that "(1) [it] owns a valid copyright" and "(2) [Tencent] copied protected aspects of [its] work." *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 940 (9th Cir. 2023). SIE can establish illicit copying by showing that Tencent had access to its work and that the "works share substantial similarities." *Id.* at 939–941 (extrinsic test plausibility at the pleading stage).

Tencent does not contest the first ownership element. Compl. ¶ 47; Mot. 19-30. Nor does it seriously contest that the Complaint plausibly alleges that *Light of Motiram* promotional materials copy protected elements of SIE's copyrighted works. Mot. 19–30.[5] The Complaint walks through the alleged infringement in exacting detail. The Complaint explains how Tencent had access to *Horizon*, approached SIE about licensing SIE's intellectual property for a new *Horizon* game, and when SIE said no, went ahead with creating and advertising a *Horizon* knockoff. Compl. ¶¶ 1, 72-127. SIE further alleged substantial similarity, detailing how Defendants misappropriated the most

---

[5] Tencent's introduction makes a drive-by assertion that *Horizon* contains "genre conventions" that SIE purportedly borrowed from another game. Mot. 1-2. But Tencent nowhere argues that SIE failed to allege that Tencent copied protected elements. *See* Mot. 19-30 (12(b)(6) arguments). Moreover, Tencent provides no admissible evidence to support its assertion. As detailed in SIE's opposition to Defendants' request for judicial notice, while the Court may judicially notice the fact that webpages submitted as exhibits exist, the Court may not treat any alleged facts contained therein as true or established. *See* Opp. to Req. for Judicial Notice.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:25-CV-06275-JSC

distinctive and recognizable protected elements of the *Horizon* Franchise—its overall tone and feel, setting, narrative, characters, and visual expression. *Id*. ¶¶ 75–79. SIE provided specific side-by-side comparison images showing the copied setting, tribes, Machines, main character Aloy, and other expressive choices such as the images below. *Id*. ¶¶ 89, 93, 95, 98, 109, 111.



And SIE further alleged that *Light of Motiram*'s music closely mimics *Horizon*'s music, being "highly similar thematically and in specific melodies, sounds, rhythms, and structure," and that Tencent even hired a composer from a *Horizon* soundtrack "to replicate the unique sound." *Id*. ¶ 7.

Rather than contest the allegations of copying and similarity between *Light of Motiram* and *Horizon*, Tencent plays a shell game. Tencent argues the Complaint fails to allege infringement (1) by specific defendants, and (2) in the United States. These arguments fail.

### 1.    SIE Sufficiently Alleges Copyright Infringement by All Defendants.

Hiding behind their deliberately opaque corporate structure made up of a Cayman Islands "holding company," "brands" such as "Level Infinite" and "Aurora Studios," Singaporean and Chinese subsidiaries, a Tencent Games "division," and U.S. subsidiaries of these various affiliates, Defendants argue that the Complaint contains insufficient allegations as to *which* Tencent entity engaged in which infringing conduct. Mot. 20–24, 34–35; Compl. ¶ 33. Tencent contends SIE engaged in "improper group pleading" and failed "to plead any nonconclusory allegations regarding conduct by any one of th[e] Defendants." Mot. 19. Defendants are wrong.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:25-cv-06275-JSC

To satisfy Rule 8, a plaintiff need only "provide sufficient notice to all of the Defendants as to the nature of the claims being asserted against them," including "what conduct is at issue." *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 964 (N.D. Cal. 2015). In light of Tencent's "deliberately opaque" corporate structure, SIE's Complaint alleges that each Defendant engaged in the infringing conduct alleged in the Complaint. The Complaint clearly defines the terms "Tencent" and "Defendants" to refer to "Tencent Holdings," "Tencent America," and Proxima Beta U.S." Compl. ¶ 1. Each time SIE referred to "Tencent" or "Defendants" it "ma[d]e the same allegations as to [each] defendant[]." *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1104 (S.D. Cal. 2024) (holding collective reference to two defendants throughout complaint "adequately pled claims"); *T Niantic, Inc. v. Global++*, 2019 WL 8333451, at *4 (N.D. Cal. Sept. 26, 2019) ("While Niantic makes claims against 'Defendants' generally in certain paragraphs of the Complaint, the term 'Defendants' is clearly inclusive of Global++, Hunt, and Hundur."). As such, the Complaint is "fairly … read to claim that each of the … Defendants participated in the specific wrongful conduct alleged." *Tivoli LLC v. Sankey*, 2015 WL 12683801, at *3 (C.D. Cal. Feb. 3, 2015) (finding fair notice when complaint asserted copyright and trademark infringement claims against four affiliated defendants collectively).

Courts routinely reject "improper group pleading" arguments like Tencent's where, as here, the defendants are all members of a single corporate conglomerate with ill-defined roles. *See, e.g.*, *Id.*; *Adobe*, 125 F. Supp. 3d at 964; *Bhatia*, 725 F. Supp. 3d at 1104; *T Niantic, Inc.*, 2019 WL 8333451, at *4. A plaintiff is not required to "differentiate between the roles of the various Defendants, … [when the] [p]laintiff would not have knowledge of each defendant's specific role" without discovery. *Woodall v. Walt Disney Co.*, 2021 WL 4442410, at *6 (C.D. Cal. Aug. 5, 2021) (rejecting group pleading argument); *see also Formal Ent. LLC v. Malik*, 2024 WL 4404426, at *6 (C.D. Cal. May 30, 2024) (same); *Heller v. NBCUniversal, Inc.*, 2016 WL 6573985, at *3 (C.D. Cal. Mar. 30, 2016) (same); *Bolling v. Mercedes-Benz USA, LLC*, 2025 WL 83826, at *7 (N.D. Ga. Jan. 10, 2025) ("The Court sees little reason to dismiss claims simply because a plaintiff could not divine the byzantine inner workings of a corporate conglomerate."). Each Defendant remains free to argue that it did not, in fact, engage in the alleged conduct, but they cannot argue that the

Complaint fails to put them on notice of the conduct at issue. "Defendants' decision to obscure their distinct corporate identities … cannot now shield them from suit." *Advanta-STAR Auto. Rsch. Corp. of Am. v. Search Optics, LLC*, 672 F. Supp. 3d 1035, 1045 (S.D. Cal. 2023) (finding fair notice when complaint asserted a claim for copyright infringement by referring to the defendants collectively).

The "group pleading" cases on which Tencent relies are all inapposite. Those cases involved many unrelated defendants and not a single corporate conglomerate.[6] While "[c]ollective references to defendants often causes confusion when broad allegations are directed at a large and diverse group of defendants," that is not the case where, as here, "the group is much narrower, closely related, and in the same general line of business," *Tivoli*, 2015 WL 12683801, at *3, and Defendants have "obscured" their distinct corporate identities, *Advanta-STAR*, 672 F. Supp. 3d at 1045. The Tencent conglomerate of parent companies, subsidiaries, affiliates, brands and divisions created, distributed, and publicly performed the infringing promotional materials, with the precise allocations of responsibility being only within Defendants' knowledge at this stage of the case. Tencent may not avoid liability via a corporate shell-game.

In any event, SIE also did far more than allege infringement by all Defendants collectively. It provided additional specific allegations as to the roles of Tencent Holdings, Tencent America, and Proxima Beta U.S. further putting them on notice of their alleged roles in the infringement.

***Tencent Holdings.*** SIE alleges that Tencent Holdings approached SIE executives in San Francisco about licensing *Horizon*; that Tencent Holdings applied to register the LIGHT OF

---

[6] *See Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988) (dismissing civil rights action based on collective allegations against state agency, three agency employees, and nine unrelated and unaffiliated private contractors and subcontractors); *In re iPhone Application Litig.*,2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011) (dismissing privacy law claims based on collective allegations against multiple unrelated and unaffiliated companies in the mobile phone industry); *Steward v. West*, 2013 WL 12120232, at *3 (C.D. Cal. Sept. 6, 2013) (dismissing copyright infringement action brought against 13 unrelated defendants based on collective allegations that 56 different works infringed plaintiffs' copyright and complaint did not explain which infringing work was attributable to which unrelated defendant); *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 962 (S.D. Cal. 1996) (dismissing patent infringement action brought against multiple unrelated defendants premised upon collective allegations against the unrelated defendants and granting leave to amend).

MOTIRAM trademark; and that Tencent Holdings intends to publish and distribute, or to license or otherwise authorize the publishing and distribution of, the game *Light of Motiram* in the United States. Compl. ¶¶ 18-19, 65. These allegations, alone and in combination with SIE's allegations against all Defendants, support a reasonable inference that Tencent Holdings is behind the development and promotion of *Light of Motiram* in the United States and put Tencent Holdings on notice of the conduct at issue.

   ***Tencent America***. Likewise, SIE alleges additional specific facts that both alone and in combination with SIE's allegations against all Defendants, support a reasonable inference that Tencent America is also behind the development and promotion of *Light of Motiram* in the United States and put Tencent Holdings on notice of the conduct at issue. SIE alleges that Tencent America is the U.S. arm of Tencent Holdings. Compl. ¶ 23. SIE further alleges that that Tencent America attended the licensing meeting with SIE in San Francisco and *is currently involved* and/or will be involved in marketing, promotion, and operation of the forthcoming beta and U.S. release. *Id.* ¶ 25. And SIE alleged Tencent America is involved in work associated with the Level Infinite publishing brand that announced *Light of Motiram*. *Id.* ¶ 26.

   ***Proxima Beta U.S.*** As to Proxima Beta, in addition to the allegations as to all Defendants, SIE alleges that Proxima Beta U.S. employees will assist in the publication and/or distribution of *Light of Motiram* in the United States. Compl. ¶ 32. SIE further supported that allegation by alleging that Proxima Beta U.S. operates as the U.S. affiliate through which Proxima Beta Singapore conducts U.S. activity, and that Proxima Beta Singapore has "published marketing materials that infringe SIE's copyrights and trademark." *Id.* ¶¶ 30-31.

   SIE has more than met the Rule 8 standard for pleading a copyright infringement claim and put Defendants on notice of the accusations against them. The Court should deny Tencent's motion to dismiss SIE's copyright claims.

   **2.**   **SIE Sufficiently Alleges Copyright Infringement in The United States.**

   Defendants also briefly argue that SIE failed to allege "any non-speculative facts demonstrating that any purported publishing and distribution [of the *Light of Motiram* game] by the MTD Defendants 'will occur *in the United States*.'" Mot. 23. This is absurd. The Complaint

alleges imminent distribution on the Steam and Epic Games platforms, both of which are located in the United States. Compl. ¶ 74. And it alleges images, videos, and gameplay *from the game* have already been distributed in the U.S. via not only the official www.lightofmotiram.com website as well as Steam and Epic Games, but also through Discord, YouTube, Reddit, Facebook, Instagram and X, most of which are *based in this District*. *Id.* ¶¶ 7, 72-76, 114, 121, 138. Tellingly, even Defendants do not make this argument as to their mass distribution of *promotional* materials throughout the United States. Mot. 23-24. This is no basis to dismiss any claims. Mot. 23.

SIE further alleges domestic conduct as to each Defendant. SIE alleges that Tencent Holdings "intentionally planned, authorized, and facilitated infringing acts that have or will take place in California, including licensing and distributing infringing material" and that Tencent Holdings intends to "publish and distribute, or to license or otherwise authorize the publishing and distribution of, the game *Light of Motiram* in the United States." Compl. ¶¶ 18, 36. SIE likewise alleges that Tencent America and Proxima Beta U.S. "intentionally planned, authorized, and facilitated infringing acts that have or will take place in California." *Id.* ¶¶ 38, 40. SIE further alleged that Tencent America and Proxima Beta U.S. are the United States arms directly involved in the production and distribution of *Light of Motiram* and that Proxima Beta *U.S.* employees "will assist in the publication and/or distribution of Light of Motiram." *Id.* ¶¶ 25, 28, 32. These allegations state a claim against each defendant involving domestic conduct.

## B.    SIE Sufficiently Alleges Trademark Infringement by All Defendants.

The gravamen of SIE's trademark claims in Counts 2 and 3 is that Tencent copied SIE's trademark in the central protagonist of the *Horizon* Franchise, Aloy—a widely recognized symbol of both the Franchise and SIE. Tencent used an Aloy doppelganger as a central aspect of its promotional campaign in a manner intended to confuse the relevant consuming public into forming an association between *Light of Motiram* and *Horizon*, exploit *Horizon*'s goodwill, and attract *Horizon* fans to its competing knock-off game. SIE's Complaint is filled with facts supporting these claims alleged against all Defendants that more than satisfy the Rule 8 pleading standard. *Supra* 12-15 (explaining SIE properly alleges conduct as to all members of the Tencent conglomerate).

Lanham Act false designation of origin and California common-law trademark infringement claims are analyzed under the same likelihood-of-confusion standard. *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (California common-law and Lanham Act trademark claims are substantially congruent); Mot. 24-25. SIE must allege facts supporting that (1) it holds a protectable mark, and (2) Tencent's imitating mark is likely to cause consumer confusion. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).

### 1. SIE Sufficiently Alleges the ALOY Character Mark Is Protectable.

"For over a century, trademark and unfair competition law has protected the names and appearance of characters." McCarthy on Trademarks and Unfair Competition § 4.2 (5th ed. May 2025 update). "[I]ngredients" of "entertainment characters" that are protectable under trademark law include their "physical appearances and costumes." *DC Comics, Inc. v. Filmation Assocs.*, 486 F. Supp. 1273, 1277 (S.D.N.Y. 1980); *see Universal City Studios, Inc. v. J.A.R. Sales, Inc.*, 1982 WL 1279, at *4 (C.D. Cal. Oct. 20, 1982) (finding "physical appearance of the character 'E.T.'" protectable trademark); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404–05 (9th Cir. 1997) (recognizing the stove-pipe hat worn by the Cat character in Dr. Seuss's "The Cat in the Hat" functioned as a trademark). The ALOY Character Mark is just such a mark.

***The distinctive ALOY Character Mark.*** The Complaint describes the ALOY Character Mark as consisting of a female huntress with distinctive red hair, clad in tribal-inspired attire, and adorned with futuristic materials, such as headgear, scavenged from defeated Machines. Compl. ¶ 48. She is also depicted with tribal features, such as bold tribal warpaint and various weapons and accessories. *Id*. This fusion of primitive and machine elements is a distinct visual identity of the franchise, of which Aloy functions as its emblem. *Id*. Aloy's look is unrelated to any utilitarian aspect of the game and serves a source-identifying function that distinguishes the *Horizon* Franchise from other videogame products, entitling the ALOY Character Mark to strong protection. *See Pom Wonderful*, 775 F.3d at 1126.

***SIE's use of Aloy as a mark in commerce.*** The Complaint alleges SIE has made continuous, prominent use of the ALOY Character Mark as a *Horizon* brand identifier dating back to February 2017. Comp. ¶¶ 114, 127, 136. She is featured across game packaging, digital storefront

banners, PlayStation site headers, social-media avatars, trailers, and licensed merchandise—including apparel, board games, action figures, plush toys, figurines, costumes, art prints, jewelry, and a variety of other items. *Id.* ¶¶ 4, 63, 114–16, 118–19; *see Warner Bros. Ent., Inc. v. X One X Prods.*, 840 F.3d 971, 980 (8th Cir. 2016) (affirming plaintiff's use of images of characters from its movies and cartoons on consumer goods is a trademark use). Indeed, Tencent's pitch deck to SIE even included SIE's *Horizon* promotional material prominently featuring Aloy as shown below:



Comp. ¶ 67. Aloy has become the face of the *Horizon* Franchise and a widely recognized symbol of SIE more broadly. *Id.* ¶ 118. Due to SIE's investment in the promotion of the ALOY Character Mark, consumers and media outlets note Aloy is one of the all-time Iconic Video Game Characters, is "recognizable to almost everyone in the PlayStation community," serves as a "PlayStation Mascot," and is inseparable from the SIE brand. *Id.* ¶¶ 4, 97, 118-19. Indeed, SIE has even included Aloy as a playable character or in cameos in other of its videogames, thereby further cementing the ALOY Character Mark as synonymous with SIE / Sony PlayStation in the minds of the consuming public. *Id.* ¶ 4.

### 2. SIE Sufficiently Alleges That Tencent's Use of a Lookalike ALOY Character Mark Is Likely to Cause Consumer Confusion.

In determining whether a complaint plausibly alleges likelihood of confusion, Courts in this jurisdiction employ the *Sleekcraft* analysis. *24/7 Customer, Inc. v. 24-7 Intouch*, 2015 WL 1522236, at *4 (N.D. Cal. Mar. 31, 2015). The *Sleekcraft* factors are: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) defendant's intent in selecting the mark; (7) types of services and

1    degree of care; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*,

2    599 F.2d 341, 348–49 (9th Cir. 1979).

3        At the pleading stage a plaintiff need not prove a likelihood of consumer confusion. *Visual*

4    *Changes Skin Care Int'l, Inc. v. Neways, Inc*., 2008 WL 4723603, at *4 (E.D. Cal. Oct. 24, 2008)

5    ("a plaintiff is not required to prove the likelihood of confusion at the pleading stage."). Trademark

6    infringement claims require a fact-intensive analysis rendering them particularly ill-suited for

7    determination on a motion to dismiss. *See, e.g., 24/7 Customer, Inc*., 2015 WL 1522236, at *5 ("the

8    likelihood of confusion inquiry 'is a factual determination . . . that courts routinely treat ... as [an

9    issue] of fact' best left for the determination by a jury.") (citations omitted); *Church & Dwight Co.,*

10   *Inc. v. Mayer Lab., Inc.*, 2011 WL 1225912, at *20 (N.D. Cal. Apr. 1, 2011) ("Consumer confusion

11   is generally a factual determination . . . that cannot be made at this stage."). The Complaint need

12   only allege facts that, taken as true, plausibly allege a likelihood of consumer confusion. The

13   Complaint does so.

14       SIE has plausibly alleged a likelihood of consumer confusion. As detailed in Section II.B.1

15   *supra*, the Complaint includes specific facts supporting that the ALOY Character Mark is a strong

16   mark synonymous with SIE in the minds of the consuming public. The Complaint also alleges that

17   Tencent has adopted SIE's approach to branding by using images of a character, virtually identical

18   to the ALOY Character Mark (i.e., a huntress character with red-hair, clothed in similar tribal attire,

19   often adorned with tribal face paint and headgear made from machine animal parts) as a logo for

20   the *Light of Motiram* game on Steam banners, website mastheads, social-media avatars, app-store

21   icons, and trailer stills, as shown below. Compl. ¶¶ 11, 98, 112-27.



OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:25-CV-06275-JSC

Similarly, the Complaint further alleges that Tencent's promotional material prominently depicts the Aloy lookalike as the *sole character* for its *Light of Motiram* game in the same manner as SIE prominently depicts Aloy as the *sole character* on its *Horizon* promotional material (*i.e.* in the foreground, to the left of the game title, overlooking the landscape of the game).

 

Compl. ¶ 6; *In re Stallard*, No. 97115036, 2023 WL 5607600, at *2 (TTAB Aug. 28, 2023) (finding a video game character can serve as a trademark if it is the central character perceived by the purchasing public and distinguishes the source of the game).

Tencent's effort to trade off of the ALOY Character Mark's goodwill and reputation is so egregious that numerous journalists and *Horizon* fans noted the striking similarities between the ALOY Character Mark and Tencent's use of the Aloy lookalike, stating Tencent's lookalike "resembles Aloy to a tee – red hair and all," "is dressed like Aloy with a similar assortment of frills," down to "her bow and the blue and orange ropes that decorate her body" and that the "character design" and "costume…very clearly just looks like Aloy." Comp. ¶ 125 & n. 36. One journalist even stated that "if someone told me this is a spin-off of [*Horizon*], I would easily believe them." *Id*. ¶ 9.

Thus, the Complaint alleges a multitude of specific facts showing that Tencent was aware of the ALOY Character Mark, chose to use a nearly identical Aloy knock-off character to promote an identical product (a competing video game), using the same marketing channels used by SIE to promote *Horizon* (e.g., Steam, Facebook, Instagram, X, Discord, YouTube, and Reddit), in a manner that has caused (and is likely to cause) the relevant consuming public to be confused.

SIE has more than met the Rule 8 pleading standard and Tencent's motion to dismiss SIE's trademark claims should be denied.

### 3.    Tencent's Arguments Fail To Establish Any Pleading Defect.

Recognizing the enormity of its uphill battle to dismiss SIE's well-pled trademark claims at the pleading stage, Tencent resorts to proffering a scattershot of arguments. None are availing.

***First***, Tencent argues that the ALOY Character Mark is not protectable due to variations in her appearance. Mot. 26-28. Tencent dedicates pages of its brief detailing minute differences in the Aloy character's clothing, face paint, and accessories to assert that SIE has failed to adequately identify the ALOY Character Mark. *Id.* Of course, details of Aloy's appearance and costumes change. *She is the main character of a videogame*, not a static character mark like the Brawny Man. Mickey Mouse in Fantasia is still recognizably Mickey Mouse despite the fact that he swapped his red overalls for a wizard's robe and hat. The fact that Aloy's face paint or accessories change with gameplay does not erase the stable, source-identifying character SIE has built and consumers recognize. The law does not demand pixel-perfect sameness; it asks whether the character's consistent identity persists in the eye of the relevant consumer such that a knockoff is likely to lead to confusion. *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1206-07 (9th Cir. 2000) (Finding "trivial distinctions between [marks]" and fact that plaintiff's "mark [was] occasionally shown with different colors" did not defeat likelihood of confusion, especially when remarkably similar marks were used for competing services on the same online marketing channels.); 3 McCarthy, Trademarks and Unfair Competition § 17:26, p. 17–71 (4th ed. 2014) ("'Commercial impression,' like most issues in trademark law, should be determined from the perspective of the ordinary purchaser of these kinds of goods or services"); *cf. Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422, (2015) (variations of a mark are considered "legal equivalents" when the variations create the same continuing commercial impression such that consumers consider the variations as the same mark); *DC Comics v. Towle*, 802 F.3d 1012, 1020 (9th Cir. 2015) (copyright case recognizing "a character may be protectable if it has distinctive character traits and attributes, even if the character does not maintain the same physical appearance in every context."). Here, the relevant consumer population are players of video games. As evidenced by the numerous comments from gaming publications and players *supra*, the relevant population recognizes the ALOY Character Mark as synonymous with the *Horizon* Franchise and SIE.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:25-cv-06275-JSC

The cases Tencent cites to support its argument that SIE failed to identify the ALOY Character Mark are inapposite. In *Coach, Inc. v. Celco Customs Servs. Co.*, the "complaint list[ed] fifty registered trademarks,[ ]but ma[de] no effort to identify which of those trademarks [were] at issue in [the] case." 2012 WL 12883972, at *4 (C.D. Cal. Oct. 31, 2012). In *Ketab Corp. v. Mesriani & Assocs., P.C.*, the district court found after a jury trial that the alleged marks at issue were generic, the services were "totally unrelated," and the plaintiff failed to allege which of its alleged marks the defendants infringed. 734 F. App'x 401, 406 (9th Cir. 2018). In *Sony Pictures Ent., Inc. v. Fireworks Ent. Grp., Inc*, the court denied a motion for preliminary injunction because, *inter alia*, it was unclear plaintiff had right to license the Zorro character and the description of the trademark and tradedress at issue, namely "the appearance, skills, secret identity motif, personality traits, personal background, setting, signature 'Z' mark, or 'rearing horse' mark, or any confusingly similar combination of some of those distinctive elements" was too vague to be a protectable mark. 137 F. Supp. 2d 1177, 1196 (C.D. Cal. 2001), *vacated pursuant to settlement*, 2002 WL 32387901 (C.D. Cal. Nov. 5, 2002). The court found "[g]iven that Plaintiffs cannot point to a specific mark at issue, and that it is unclear whether Plaintiffs have the right to license the character Zorro, Plaintiffs' trademark claim at this time remains undefined and unfocused." *Id.* Unlike the cited cases, here, the Complaint identifies one mark—the ALOY Character Mark—in detail, and describes multiple instances of consumers and gaming press recognizing the strength of the mark and Tencent's blatant copying of the mark. *See* Section II.B.1-2 *supra*.

**Second**, Tencent contends that SIE fails to adequately allege specific evidence showing the ALOY Character Mark is used in commerce as a signifier of the *Horizon* Franchise. Not so. As shown in Section II.B.1 *supra*, the Complaint alleges more than enough facts to satisfy the Rule 8 pleading requirement that the ALOY Character Mark serves as a trademark and is viewed in the eyes of the relevant consuming public as a source identifier for *Horizon* and SIE. Compl. ¶¶ 48, 114-15, 118.

The cases Tencent cites to support this argument are either distinguishable or inapposite. Mot. 29-30. In *In re Stallard*, the TTAB found that a fictitious character in a game may "serve a dual purpose, i.e., serve both as a character in the [game] and as a trademark" as long as the character is "perceived by the purchasing public not just as a character but also as a mark which identifies and distinguishes the source of the [game]." 2023 WL 5607600, at *2. The TTAB affirmed the denial to register the mark for a character because the character was not the main character of the game and was not prominently featured on the game's website and promotional materials, unlike the game's main character. *Id.* at *6. Accordingly, the proposed mark was "merely associated with one character in the game, and [was] not used in a way to identify and distinguish the source of the game itself…." *Id.* Here, as detailed above, SIE pled facts supporting that the ALOY Character Mark is perceived by the relevant purchasing public—the gaming community—as a source identifier for SIE and the *Horizon* Franchise. Indeed, Defendants' Ex. 5 to its motion shows the ALOY Character Mark used prominently on the *Horizon* webpage and on t-shirts with no mention of *Horizon*, evidencing that the mark alone acts as a source identifier for consumers.







Mot. 5.

In *Dfinity Found. v. Meta Platforms, Inc.* (Mot. 29), the complaint failed to adequately allege use in commerce because it contained only a conclusory allegation that the mark was "used in commerce." 2022 WL 16857036, at *3-4 (N.D. Cal. Nov. 10, 2022). Here, SIE has alleged a plethora of facts supporting its use of the ALOY Character Mark in commerce. *See* Section II.B.1.

In *BuzzBallz, L.L.C. v. BuzzBox Beverages, Inc.* (Mot. 30), when ruling on a *motion in limine* before trial, the court found that trademark registrations and a company's homepage employing one of the marks at issue insufficient to lay a foundation that each of the asserted marks were actually used in commerce, and so excluded evidence of the marks unless and until defendants could submit admissible evidence demonstrating actual use. 2016 WL 7496769, at *3 (C.D. Cal. Apr. 12, 2016). This case is inapposite both because the procedural posture requires completely different standards and because SIE's Complaint is replete with facts supporting the use of the ALOY Character Mark in commerce.

***Third***, Tencent makes much to do of the Complaint's use of the term "silhouette" to argue the ALOY Character Mark is insufficiently defined. Mot. 27-28. This strawman argument deserves no credence. The Complaint specifically refers to Aloy's "layered silhouette," Comp. ¶ 48, as an idiom that refers to an image, design, or outfit created by overlapping different shapes, elements, or clothing pieces to add depth, dimension, and visual interest. Specifically, the Complaint states the Aloy character has a "layered silhouette that mirrors the fusion of primitive and futuristic

1    elements" that "reinforces the game's aesthetic themes of hunter and machine animals." *Id.* ¶ 48.

2    The Complaint's use of the word "silhouette" does not render the ALOY Character Mark

3    insufficiently defined.

4        The Court should deny Tencent's request to dismiss SIE's trademark claims as the

5    Complaint sufficiently pleads facts supporting the claims.

6    **III.    THIS COURT HAS PERSONAL JURISDICTION OVER TENCENT HOLDINGS.**

7        Recall, Tencent Holdings is the mothership—a billion-dollar global technology

8    conglomerate that has an office in California, operates "Tencent Games," owns the "in house"

9    studio creating *Light of Motiram*, attempted to license *Horizon* in California, and is targeting *Light*

10   *of Motiram* at the United States through a trademark and website registered in the United States.

11   *Supra* 5-8. Yet Tencent Holdings maintains this Court lacks jurisdiction over it. Not so. This Court

12   has personal jurisdiction here, both under California's long-arm statute and Federal Rule of Civil

13   Procedure 4(k)(2).[7]

14   **California's Long-Arm Statute:** When personal jurisdiction over a defendant is not

15   authorized by a federal statute (as here), jurisdiction may be established under the forum's state

16   law. *See* Fed. R. Civ. P. 4(k)(1); *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750 (9th Cir. 2025) (en

17   banc). Under California's long-arm statute, Cal Civ. Proc. Code § 410.10, personal jurisdiction is

18   permitted to the maximum extent that the Fourteenth Amendment's Due Process Clause allows.

19   *Briskin*, 135 F.4th at 750. For that inquiry, courts consider three factors: whether "(1) the defendant

20   purposefully directed its activities at residents of the forum or purposefully availed itself of the

21   privilege of doing business in the forum; (2) the plaintiff's claim arises out of or relates to those

22   activities; and (3) the assertion of personal jurisdiction is reasonable and fair." *Adobe*, 125 F. Supp.

23   3d at 959–60 (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).

24       The burden on the first two factors rests on the plaintiff; the burden on the third factor—

25   why it would be constitutionally unreasonable to exercise jurisdiction—lies with the defendant.

26   Tencent bears a high burden on the third factor: it requires Tencent to "present a *compelling* case"

27   _____

28   [7] SIE reserves the right to assert general personal jurisdiction should discovery show that Tencent
     Holdings contacts are sufficiently "continuous and systematic." *Briskin*, 135 F.4th at 750.

of "considerations [that] would render jurisdiction unreasonable." *Briskin*, 135 F.4th at 751 (emphasis added) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

**Federal Long-Arm Statute:** Even if California's long-arm statute did not permit personal jurisdiction over Tencent Holdings, a federal court can exercise jurisdiction over a nonresident company if not subject to general personal jurisdiction in any state court and "consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). Rule 4(k)(2), often called the federal long-arm statute, allows a court to exercise jurisdiction over nonresident defendants who have sufficient contacts with the United States as a whole, but whose contacts are scattered among the states such that no state has jurisdiction.

Exercising personal jurisdiction under the rule requires a claim (1) arising under federal law (2) against a defendant not subject to any state courts of general jurisdiction, and (3) for which exercising jurisdiction comports with due process, *viz.*, it would not be unfair or unreasonable. With respect to the third due process prong, the Supreme Court recently clarified that the due process required for exercising jurisdiction under Rule 4(k)(2) "permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025).

**Evidentiary Universe:** By relying on a declaration purporting to controvert allegations in the complaint, Tencent Holdings has brought a *factual* challenge to personal jurisdiction. As a result, the Court properly considers any evidence proffered by the parties outside of the complaint under the same standard that applies at summary judgment. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). When a jurisdictional challenge is based on written materials, unless the Court conducts an evidentiary hearing, a "plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). In other words, "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). When a defendant attacks the truth of only some of a complaint's allegations, like Tencent Holdings does here, uncontroverted allegations must be still taken as true, and any conflicts between the parties' evidences must be resolved in plaintiff's favor. *See Schwarzenegger*, 374 F.3d at 800.

### A.    Tencent Holdings Purposefully Directed Infringing Activities at the Forum and Its Residents.

Based on unrebutted allegations in the Complaint, and in consideration of additional evidence offered herewith, SIE has made the requisite prima facie showing that Tencent Holdings purposefully directed infringing activities into California. The purposeful direction test is satisfied if a defendant (1) "commit[ed] an intentional act," (2) "expressly aimed at the forum state," (3) which "cause[d] harm that the defendant knows will be suffered in the forum state." *Briskin*, 135 F.4th at 751.[8] Here, Tencent Holdings' conduct satisfies each element.

### 1.    Tencent Holdings Committed Intentional Acts Expressly Aimed at California and the United States.

The first two factors are met in at least three independent ways: unrebutted allegations in the Complaint, additional evidence of Tencent Holdings forum contacts, and under an agency or alter ego theory.

*First*, Tencent Holdings leaves critical allegations from the Complaint unrebutted that alone establish that it expressly aimed infringing *Light of Motiram* materials at California and the United States (even before considering additional evidence). Despite filing a carefully worded declaration that disputes *some* allegations in the Complaint, Tencent Holdings notably *did not* dispute critical facts: namely, that it "*directed* the development and imminent publication and distribution" of *Light of Motiram* "knowing that it will harm SIE in the United States" and that "Tencent Holdings' executives made the decision to continue pursuing development of the game for publication and distribution *in the United States*" after SIE demanded it stop. Compl. ¶¶ 18-19; Dkt 48-1 (Liang Declaration).[9] Unlike in the cases Tencent cites (Mot. 12), these are specific, nonconclusory allegations that clearly state Tencent Holdings engages in case-specific conduct targeted at the United States and California.

---

[8] The same test is also used to analyze whether jurisdiction under Rule 4(k)(2) comports with due process. *See Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034, 1041 (9th Cir. 2022).

[9] The in-house attorney declarant asserts only that Tencent Holdings "is not the developer or publisher of *Light of Motiram*" and that it does not "operate or market any products or services."

Further, Tencent Holdings does not dispute that it registered the trademark for *Light of Motiram* in the United States. Compl. ¶ 18. Tencent Holdings misses the point in arguing that the registration is irrelevant to jurisdiction because SIE does not allege the mark itself causes harm. Mot. 12-13. The trademark registration evidences Tencent Holdings' direct domestic participation in bringing the infringing *Light of Motiram* to California and the United States and participation in the domestic promotional campaign—that is the reason to register a trademark. Indeed, Tencent Holdings represented to this Court in other litigation that it actually uses its trademarks to "promote[] goods and services under a series of TENCENT-related trademarks." Hurst Decl. Ex. 6 ¶ 11. At the pleading stage, these uncontroverted allegations must be taken as true, and they establish jurisdiction here. *See Schwarzenegger*, 374 F.3d at 800. Directing the development, marketing, publication, and distribution *in the United States* of a video game are intentional acts expressly aimed at California and the United States. Tencent Holdings' intentional conduct is intended to generate a "nationwide audience for commercial gain." *Briskin*, 135 F.4th at 758

**Second**, there is also considerable additional evidence beyond the uncontroverted allegations from the Complaint that Tencent Holdings is not a mere holding company, but an active participant in game development and promotion, including *Light of Motiram*, in the United States and California.

Start with the evidence that Tencent Holdings is an active participant in Tencent Games. Tencent Holdings claims to be "#1 by revenue" in games globally. Hurst Decl. Ex. 2 at 5. Tencent Holdings also represents to investors that *it* has an Interactive Entertainment Group that includes "Tencent Games" and that the purported developer of *Light of Motiram*—"Aurora Studios"—is an "*in house*" development studio. Hurst Decl. Ex. 8 at 7; *supra* 6. And Tencent Holdings has *thousands* of employees, including a senior executive "responsible for international publishing of Tencent Games." Hurst Decl. Ex 3, at 64. No mere holding company has all that.

Further, Tencent Holdings operates its game business in the United States generally and California specifically, and as part of that business, promotes *Light of Motiram* in the United States. *Supra* 5-8. Tencent Holdings operates multiple offices in California. *See* Hurst Decl. Exs. 4, 16. It pitched licensing *Horizon* in this District, which evidences its direct involvement and intent to

direct *Light of Motiram* to California and the United States.[10] Compl. ¶ 65. In addition to declaring its intention to use the trademark *Light of Motiram* in commerce in the United States, Tencent Holdings also registered that domain name in the United States. Hurst Decl. Ex. 12; *see Will Co., Ltd. v. Lee*, 47 F.4th 917, 923 (9th Cir. 2022), *overruled on other grounds by Briskin*, 135 F.4th at 754-55 (finding that "'operating a … website,' purchasing a domain name and purchasing domain privacy services are all intentional acts"); *Goes Int'l, AB v. Dodur Ltd.*, 2015 WL 5043296, at *10 (N.D. Cal. Aug. 26, 2015) ("It is significant that an infringing game is being distributed in a marketplace that includes U.S. players, even if the means for distribution is selecting the default of 'worldwide' distribution."). And indeed, there is abundant evidence of promotional material, trailers, and gameplay video directed at a U.S. and California audience. *Id.* Exs. 24.A-38. All of this conduct shows express aiming at the U.S. and California, especially when viewed in light of Tencent Holdings' CEO's statement that "[p]romoting games overseas" is one of Tencent Holdings' "biggest" priorities, Courtemanche Decl. Ex. A at 10, and Tencent Holdings past representation to this Court that it "has provided … ***gaming and mobile services to users*** in … ***the United States***," Hurst Decl. Ex. 6 ¶ 9; *supra* 7-8.

This evidence plainly contradicts Tencent Holdings' attorney declaration that Tencent Holdings is purely a holding company and "does not operate or market any services," and on the motion to dismiss posture the dispute must be resolved in SIE's favor. Dkt. 48-1 ¶ 3; *See Schwarzenegger*, 374 F.3d at 800. Tencent Holdings has purposefully directed the development and promotion of the infringing *Light of Motiram* game into the United States and California.

***Third***, beyond Tencent Holdings' own forum contacts, purposeful direction is established based on the conduct of Tencent Holdings subsidiaries—Proxima Beta US and Tencent America—under an alter ego or agency theory. Personal jurisdiction under an alter ego theory exists when

---

[10] Tencent Holdings's in-house attorney-declarant asserts that none were "employees" or "executives" of Tencent Holdings. Dkt. 48-1 ¶ 6. This conclusory statement, offered by an in-house attorney rather than the participants themselves, does not even identify the persons who attended the meeting, what she did to verify their employment status, or any other necessary foundation to make the testimony credible or even admissible. But further, a Tencent attendee publicly identifies himself as an employee of "Tencent Games," which Tencent Holding's own corporate and shareholder materials establish is a group within the IEG business unit of Tencent Holdings. *See* Hurst Decl. Ex. 13.

"(1) there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Doe v. Unocal Corp.*, 248 F.3d 915, 926–27 (9th Cir. 2001). Courts have found a prima facie case of alter ego when a "parent corporation uses its subsidiary 'as a marketing conduit' and attempts to shield itself from liability based on its subsidiaries' activities," *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, 810 F. Supp. 2d 1100, 1123 (S.D. Cal. 2011) (finding alter ego), as well as when the parent and subsidiary "do[] business collectively" sharing the same name, the parent "exercises total control," and the companies comingle funds, *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 961–62 (N.D. Cal. 2015); *see also In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1165-68 (S.D. Cal. 2018).[11] Personal jurisdiction based on agency exits when "the parent company ... ha[s] the right to substantially control its subsidiary's activities." *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1024-25 (9th Cir. 2017).

Each set of facts exists here. Tencent Holdings is a massive conglomerate that deliberately obfuscates the ownership of its corporate entities. Compl. ¶ 33. Tencent Holdings holds itself out as a "Group" in investor and financial filings and does not formally distinguish between its constituents. *See, e.g.*, Hurst Decl. Ex. 3 at 2, 4, 267. As discussed, Tencent Holdings describes *its own* business as having a Games division that "own[s] Aurora Studios"—the *Light of Motiram* development studio. *Id.* Ex. 8 at 7. Tencent Holdings reports all of its revenue and debt from games on its annual report without attribution to any subsidiary. *Supra* 5; Hurst Decl. Ex 3, at 4-5, 8-9, 12-13, 16. And it uses the name Tencent to advertise its games, like *Light of Motiram*—without distinguishing between subsidiaries. *Supra* 5.

Insofar as Tencent Holdings is in fact operating the gaming business through subsidiaries, it is controlling them. Tencent Holdings' senior management includes Ma Xiaoyi, who Tencent

---

[11] In assessing alter ego, courts may also consider "the commingling of funds and other assets of the entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership of the entities, use of the same offices and employees, use of one as a mere shell or conduit for the affairs of the other, inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014).

Holdings represents "is responsible for international publishing of Tencent Games." Hurst Decl. Ex 3, at 64. Tencent Holdings does not dispute that it was *its executives* who "made the decision to continue pursuing development of the game for publication and distribution *in the United States*" after SIE demanded it stop. Compl. ¶¶ 18-19. Tencent Holdings executives, including Brent Irvin and Yan Li, also serve on the board and manage Tencent Holdings' U.S. subsidiaries Tencent America and Proxima Beta US. Hurst Decl. Exs. 17-19, 23. In June 2025, in-house counsel for Tencent Holdings submitted a declaration to a Washington district court on behalf of Defendants Tencent America and Proxima Beta U.S. LLC. *Id.* Ex. 20. Failure to disregard corporate separateness in these circumstances—when Tencent Holdings is using opaque and controlled subsidiaries to avoid liability and when at this stage of the proceedings SIE is unable to determine whether subsidiaries are undercapitalized— would result in an inequitable result. *See Pac. Bell Tel. Co. v. 88 Connection Corp.*, 2016 WL 3257656, at *4-6 (N.D. Cal. June 14, 2016) ("It is enough if the recognition of the two entities as separate would result in an injustice"; "disregarding corporate formalities can itself yield sufficient inequity for alter-ego purposes").

Either on its own or through its alter egos and agents, Tencent has engaged in intentional acts expressly aimed at California and the United States.

### 2. Tencent Holdings Caused Harm It Knew Would be Suffered in California and the United States.

Tencent Holdings knew its conduct would cause SIE harm in California and the United States. Tencent Holdings initiated meetings with SIE here in this District—knowing that SIE was headquartered in California—that failed to result in consent for the very harm it caused. It knew SIE possessed U.S. intellectual property rights in the *Horizon* Franchise. And it "made the decision to continue pursuing development of the game for publication and distribution *in the United States*." Compl. ¶¶ 18-19. The harm that SIE has suffered, both in this venue and in United States, is a "predictable consequence" of Tencent Holdings' business model and its "intent to cultivate an audience [for *Light of Motiram]* in the United States." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011); *Will Co., Ltd.*, 47 F.4th at 924; *Goes Int'l, AB*, 2015 WL 5043296. And such harm was entirely foreseeable. "It is foreseeable that the loss will be inflicted

both in the forum where the infringement took place ... and where the copyright holder has its principal place of business." *Adobe*, 125 F. Supp. 3d at 962.

Here, SIE alleged that Tencent Holdings' intentional infringing actions have caused and will continue to cause damage to SIE, including economic loss. *See, e.g.*, Compl. ¶¶ 131-34; 144, 150. "The economic loss caused by the intentional infringement of a plaintiff's copyright is foreseeable." *Mavrix Photo.*, 647 F.3d at 1231. Given that SIE is well-known as the developer of the *Horizon* Franchise, this harm to a California-based company was entirely foreseeable. *See Riot Games, Inc. v. Suga PTE, LTD.*, 638 F. Supp. 3d 1102, 1116–17 (C.D. Cal. 2022) (noting U.S.-based plaintiff was a "well-known videogame developer" of infringed game in finding defendant knew harm was likely to be suffered in U.S.); *3DO Co. v. Poptop Software, Inc.*, 1998 WL 962202, at *4 (N.D. Cal. Oct. 27, 1998) (finding foreseeable harm because "[t]he computer game industry is primarily located in California"); *Wargaming.Net Ltd. v. Blitzteam LLC*, 2021 WL 3619956, at *4 (C.D. Cal. Jan. 20, 2021) ("Because hundreds of thousands of United States' consumers play Plaintiff's games, it was foreseeable that Defendant's infringement would cause Plaintiff to suffer" harm in the forum). Indeed, Tencent met with SIE here, so it cannot plead ignorance on this factor.

### B.    SIE's Claims Arise Out of and are Related to Tencent Holdings' Forum-Related Activities

Specific personal jurisdiction requires that the plaintiff's claims arise out of or relate to defendant's forum-related activities. *See Schwarzenegger*, 374 F.3d at 802. "[I]n trademark or copyright infringement actions, if the defendant's infringing conduct harms the plaintiff in the forum, this element is satisfied." *Adobe*, 125 F. Supp. 3d at 963 (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998)); *see also Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 983 (9th Cir. 2021) (finding jurisdiction where defendant promoted products under a mark "confusingly similar to [plaintiff's] own trademark" "to capture the attention of an American audience and thereby sell allegedly infringing products" which caused plaintiff's injuries in the United States).

Here, Tencent's infringement has significantly harmed California-based SIE, as detailed in the Complaint. As discussed above, the Complaint alleges specific conduct Tencent Holdings

engaged in with a close connection between the alleged copyright and trademark infringement and California and the United States, *supra* 27-28, and SIE presented additional evidence showing Tencent Holdings directed and participated in the creation of *Light of Motiram*, and extensive marketing of the game to California, and the United States, *supra* 28-31; Hurst Decl. 24.A-38. The harm that SIE suffered as a result of Tencent's intentional conduct suffices to exercise jurisdiction over it. *See Activision Publ'g, Inc. v. EngineOwning UG*, 2023 WL 3272399, at *17 (C.D. Cal. Apr. 4, 2023) (denying motion to dismiss because if "Defendants had not purposefully directed their intentional acts … at the United States, Plaintiff would not have suffered the alleged U.S. injuries such as loss of U.S. revenue and tarnishment of their reputation among U.S. users"); *Lang Van, Inc.*, 40 F.4th at 1041-42 (finding Vietnamese corporation subject to personal jurisdiction under Rule 4(k)(2) in copyright infringement action where it "purposefully targeted American companies and their intellectual property," purposefully made its infringing content accessible to U.S. residents, chose not to geoblock access to its infringing content in the United States, and sought and received U.S. trademark protection for its infringing services). SIE's claims for copyright and trademark infringement arise out of the *Light of Motiram* game that Tencent purposefully directed to a U.S. audience, including in California.

### C.    Tencent Holdings Cannot Show That Exercising Personal Jurisdiction Would Be Unreasonable or Unfair.

Because Tencent Holdings purposefully directed its infringing activities at California (satisfying California's long-arm statute) and the United States (satisfying Rule 4(k)(2)), and because SIE's claims arise out of or relate to those activities, Tencent must "present a compelling case" that exercising jurisdiction over it would not be fair or reasonable. *Schwarzenegger*, 374 F.3d at 802. To determine whether defendant has met its burden to make a "compelling case," courts consider seven factors:

> (1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

1  *Panavision Int'l, L.P.*, 141 F.3d at 1323. Tencent Holdings has not met this high burden here.

2      **Factor 1:** Contrary to Tencent Holdings' argument, Tencent Holdings purposefully injected

3  itself into California and the United States as discussed above. *See Lang Van, Inc.*, 40 F.4th at 1042

4  (jurisdiction was reasonable where defendant "purposefully targeted American companies and their

5  intellectual property"); *Wargaming.Net*, 2021 WL 3619956, at *3) (finding expressly aimed

6  conduct by video game developer-defendant because it "chose to make its game, Battle Prime,

7  available to the United States through Apple's and Google's App stores," and "ran advertisements

8  specifically targeted at the United States" on Facebook).

9      **Factor 2:** "Unless [the] inconvenience is so great as to constitute a deprivation of due

10  process," the defendant's burden of defending itself in the forum will not "overcome clear

11  justifications for the exercise of jurisdiction." *See Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th

12  Cir. 1991). As one of the largest companies in the world, with an office in Palo Alto, Tencent

13  Holdings cannot credibly claim to be burdened by litigating here. Indeed, Tencent Holdings itself

14  has sought this Court's protection and availed itself of the U.S. legal system when seeking

15  trademark protection for *Light of Motiram*. And Tencent Holdings has engaged sophisticated legal

16  counsel that is already representing affiliated entities. *See In re ZF-TRW Airbag Control Units*

17  *Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 703-04 (C.D. Cal. 2022) (finding corporate parent had

18  "familiarity with the legal system in the United States" based, in part, on filing of trademark

19  applications in finding exercise of jurisdiction over foreign defendant reasonable).

20      **Factor 3:** Beyond a threadbare incantation of a "sovereignty barrier," Mot. 17, Tencent

21  does not explain how a United States District Court exercising jurisdiction here could unduly

22  impinge upon China's sovereignty. This case involves property rights protected by United States

23  law relating to a game promoted in the United States under a trademark registered in the United

24  States on a website domain registered in the United States. This factor therefore does not weigh

25  against jurisdiction. *See Riot Games, Inc.*, 638 F. Supp. 3d at 1118-19 (noting defendant did not

26  explain why exercise of jurisdiction in copyright case would impinge upon the sovereignty of

27  Vietnam or Singapore).

28

**Factor 4:** Contrary to Tencent Holdings' argument, Mot. 17-18, California and the United States have a "strong interest" in the enforcement of U.S. copyright and trademark statutes that weighs heavily in favor of adjudication in this forum. *See Microsoft Corp. v. Very Competitive Comput. Prods. Corp.*, 671 F. Supp. 1250, 1256 (N.D. Cal. 1987) ("[T]here is a strong interest in the policies of the federal copyright statutes that will be furthered by adjudicating the case in this forum, as opposed to Taiwan"); *Riot Games, Inc.*, 638 F. Supp. 3d at 1119 ("The United States has … [a] particularly significant interest in resolving disputes of United States copyright law involving infringement by foreign defendants.") (internal quotation marks omitted).

**Factors 5, 6 & 7:** Because SIE asserts intellectual property rights protected under United States law, there is no alternative forum—more efficient or otherwise—for its claims outside the United States, including courts in China. Further, SIE is headquartered in California in this District, and Tencent Holdings directed its conduct to this District, by among other things, attempting to license *Horizon* at a meeting just blocks from the courthouse and communicating with SIE about *Horizon* knowing SIE is based in this District. Hearing this case in the district in which SIE is based will promote convenient and effective relief for SIE.

**CONCLUSION**

For the forgoing reasons, the Motion to Dismiss should be denied in its entirety. In the unlikely event that the Court considers any claim insufficiently pled or jurisdictional element insufficiently established, SIE should be granted leave to amend and to seek discovery related to jurisdictional issues. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (remanding and explaining that plaintiff should be granted leave to conduct jurisdictional discovery).

Dated: October 15, 2025

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: */s/ Annette L. Hurst*

ANNETTE L. HURST
Attorneys for Plaintiff
Sony Interactive Entertainment LLC