ANNETTE L. HURST (BAR NO. 148738)
ahurst@orrick.com
DIANA M. RUTOWSKI (BAR NO. 233878)
drutowski@orrick.com
DANIEL D. JUSTICE (BAR NO. 291907)
djustice@orrick.com
ANA M. MENDEZ-VILLAMIL (BAR NO. 344768)
amendez-villamil@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

LAURA A. WYTSMA (BAR NO. 189527)
lawytsma@orrick.com
ISAAC BEHNAWA (BAR NO. 342441)
ibehnawa@orrick.com
355 S. Grand Street, # 2700
Los Angeles, CA 90071
Telephone: +1 213 629-2020
Facsimile: +1 213 612 2499

Attorneys for Plaintiff
SONY INTERACTIVE ENTERTAINMENT LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONY INTERACTIVE ENTERTAINMENT LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>TENCENT HOLDINGS LTD., a Cayman Islands corporation; TENCENT TECHNOLOGY (SHANGHAI) COMPANY LTD. d/b/a AURORA STUDIOS and/or POLARIS QUEST, a Chinese company; TENCENT AMERICA LLC, a Delaware limited liability company; PROXIMA BETA PTE LTD. d/b/a TENCENT GAMES and/or LEVEL INFINITE, a Singapore corporation; PROXIMA BETA U.S. LLC, a Delaware limited liability company; and DOES 1-10.<br><br>Defendants. | Case No. 3:25-cv-06275-JSC<br><br>**PLAINTIFF SONY INTERACTIVE ENTERTAINMENT LLC'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: November 20, 2025<br>Time: 10:00 a.m.<br>Courtroom: 8 – 19th Floor<br>Judge: Hon. Jacqueline Scott Corley<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.** |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................... 1

STATEMENT OF ISSUES ............................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 2

     A.    SIE Invests in Developing and Launching Horizon Zero Dawn. ..............................2

     B.    *Horizon Zero Dawn*'s Success Launches a Franchise and Spawns the Iconic ALOY Character Mark. ...................................................................................4

     C.    Tencent Seeks a License, SIE Says No, And Tencent Still Tests and Promotes *Light of Motiram* to Massive Public Outcry. ............................................5

     D.    SIE Sues, Tencent Evades. ....................................................................................7

ARGUMENT .............................................................................................................. 8

I.     SIE IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS. ........................ 9

     A.    *Light of Motiram* Is a Blatant Infringement of *Horizon* ........................................9

          1.    *Light of Motiram* Misappropriates Protectable Elements from *Horizon*. ...10

          2.    Industry Commentary Confirms Ordinary Observers View *Light of Motiram*'s Concept and Feel as Substantially Similar to *Horizon*'s. ..........16

     B.    *Light of Motiram*'s Redhead Female Icon Infringes the ALOY Character Mark. ...................................................................................................................17

          1.    The ALOY Character Mark Is Highly Distinctive and Strong. .................17

          2.    Tencent's Deliberate Use of an Aloy Clone Causes Actual Confusion. ......18

II.    SIE IS LIKELY TO SUFFER IRREPARABLE HARM. ...................................... 20

     A.    Tencent's Infringement Interferes with SIE's Creative Control and Jeopardizes Licensing and Expansion Plans. ........................................................20

     B.    SIE Will Suffer Unquantifiable Losses to Goodwill and Reputation. ....................22

III.   THE BALANCE OF HARDSHIPS FAVORS SIE. .............................................. 23

IV.   A PRELIMINARY INJUNCTION WILL PROTECT THE PUBLIC INTEREST. ......... 23

V.    THE COURT SHOULD NOT REQUIRE A BOND. ........................................... 24

CONCLUSION .......................................................................................................... 24

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*A&M Recs., Inc. v. Napster, Inc.,*

5
  239 F.3d 1004 (9th Cir. 2001) ...............................................................21

6

*AMF Inc. v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir. 1979) ..........................................................18, 20

7

*Apple, Inc. v. Psystar Corp.,*

8
  673 F. Supp. 2d 943 (N.D. Cal. 2009) ..................................................20

9

*Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.,*

10
  672 F.2d 607 (7th Cir. 1982) ..........................................................10, 13

11

*Boldface Licensing %8F Branding v. By Lee Tillett, Inc.,*
  940 F. Supp. 2d 1178 (C.D. Cal. 2013) ................................................20

12

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.,*

13
  174 F.3d 1036 (9th Cir. 1999) ...............................................18, 20, 23

14

*Columbia Pictures Indus., Inc. v. Miramax Films Corp.,*

15
  11 F. Supp. 2d 1179 (C.D. Cal. 1998) ........................................2, 10, 16

16

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,*
  321 F.3d 878 (9th Cir. 2003) .................................................................24

17

*Daybreak Game Co. LLC, v. Kristopher v. Takahashi,*

18
  2025 WL 2691161 (S.D. Cal. Sept. 19, 2025)................................2, 8, 20

19

*DC Comics, Inc. v. Filmation Assocs.,*
  486 F. Supp. 1273 (S.D.N.Y. 1980).......................................................17

20

*DC Comics v. Towle,*

21
  802 F.3d 1012 (9th Cir. 2015) ...............................................................17

22

*Disney Enters., Inc. v. VidAngel, Inc.,*

23
  869 F.3d 848 (9th Cir. 2017) ....................................................21, 23, 24

24

*GoTo.com, Inc. v. Walt Disney Co.,*
  202 F.3d 1199 (9th Cir. 2000) ...............................................................19

25

*Hanagami v. Epic Games, Inc.,*

26
  85 F.4th 931 (9th Cir. 2023) ......................................................9, 13, 14

27

28

i

*Helene Curtis Indus. v. Church & Dwight Co.*,
    560 F.2d 1325 (7th Cir. 1977) ...................................................................................23

*Hidden Empire Holdings, LLC v. Angelone*,
    2022 WL 17080131 (C.D. Cal. Sept. 30, 2022) ...........................................................23

*Interplay Ent. Corp. v. TopWare Interactive, Inc.*,
    751 F. Supp. 2d 1132 (C.D. Cal. 2010) .........................................................2, 21, 22

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ......................................................................21

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*,
    900 F. Supp. 1287 (C.D. Cal. 1995) ...........................................................10, 16, 22

*Micro Star v. Formgen Inc.*,
    154 F.3d 1107 (9th Cir. 1998) .....................................................................................9

*Niantic, Inc., v. Global ++, et al.*,
    2019 WL 8333451 (N.D. Cal Sept. 26, 2019) ............................................................23

*Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*,
    692 F.2d 1272 (9th Cir. 1982) ...................................................................................24

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) .............................................................................17, 18

*Sega Enters. Ltd. v. MAPHIA*,
    857 F. Supp. 679 (N.D. Cal. 1994) .........................................................................9, 22

*Shaw v. Lindheim*,
    919 F.2d 1353 (9th Cir. 1990) ...................................................................................16

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
    562 F.2d 1157 (9th Cir. 1977) ...............................................................................9, 10

*Spry Fox LLC v. LOLApps Inc.*,
    2012 WL 5290158 (W.D. Wash. Sept. 18, 2012)...................................................10, 16

*Tetris Holding, LLC v. Xio Interactive, Inc.*,
    863 F. Supp. 2d 394 (D.N.J. 2012) .............................................................................10

*Triad Sys. Corp. v. Se. Exp. Co.*,
    64 F.3d 1330 (9th Cir. 1995) .....................................................................................23

*Unicolors, Inc. v. Urb. Outfitters, Inc.*,
    853 F.3d 980 (9th Cir. 2017) .................................................................................9, 16

*Universal City Studios, Inc. v. Film Ventures Intl., Inc.*,
    543 F. Supp. 1134 (C.D. Cal. 1982) ........................................................................21

*Universal City Studios, Inc. v. J.A.R. Sales, Inc.*,
    1982 WL 1279 (C.D. Cal. Oct. 20, 1982)..........................................................17, 21

*Waymo LLC v. Uber Techs., Inc.*,
    2017 WL 2123560 (N.D. Cal. May 15, 2017) .........................................................24

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................................8

**Statutes**

15 U.S.C § 1116(a) ............................................................................................................20

17 U.S.C. § 410(c) ...............................................................................................................9

**Other Authorities**

McCarthy on Trademarks and Unfair Competition § 4.2, 10:43 ....................................17

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

PLEASE TAKE NOTICE that on November 20, 2025, at 10:00 a.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Jacqueline Scott Corley, located in Courtroom 8, on the 19th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Plaintiff Sony Interactive Entertainment LLC ("SIE") will and hereby does move this Court, pursuant to Federal Rule of Civil Procedure 65, for an order to protect its copyrights in *Horizon Zero Dawn* and *Horizon Forbidden West* (the "*Horizon* Works") and trademark rights in *Horizon*'s female protagonist (the "ALOY Character Mark") during the pendency of this action.

Specifically, SIE seeks a preliminary injunction enjoining Defendants ("Tencent") from reproducing, preparing derivative works of, displaying, performing, and distributing any works copied or derived from SIE's *Horizon* Works, including *Light of Motiram*, and from using the ALOY Character Mark or any confusingly similar mark pending trial. The grounds for this motion are that SIE is likely to succeed on the merits of its copyright and trademark claims; that it will suffer irreparable harm during the pendency of this action absent the requested relief; that the balance of equities favors SIE; and that the public interest will be served by issuing a preliminary injunction to maintain the status quo during the pendency of this action.

This Motion is based upon the Complaint filed in this action, the Memorandum of Points and Authorities following herein, as well as the Declarations of Diana Rutowski, Jan-Bart van Beek, Lucas van Tol, Asad Qizilbash, and Matthew Kuykendall and exhibits thereto, filed herewith, the previously filed Declarations of Annette L. Hurst (Dkt. 61-1) and Olivier Courtemanche (Dkt. 63), as well as such other and further papers that may be filed in support of the Motion, and any other evidence or argument presented in support prior to or at the hearing of this Motion.

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-cv-06275-JSC

**STATEMENT OF ISSUES**

Whether the Court should preliminarily enjoin Defendants from continuing to infringe the *Horizon* Works and the ALOY Character Mark during the pendency of this action, where SIE is likely to succeed on the merits of its copyright and trademark claims, will suffer irreparable harm absent the requested relief, the balance of equities favors SIE, and the public interest is served by the injunction?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Creating a successful video game requires a tremendous investment of time and money fueled by audiovisual and storytelling inspiration. SIE invested six years and considerable sums to create *Horizon Zero Dawn*, a blockbuster video game that spawned a highly successful *Horizon* Franchise. Tencent wanted to short circuit this costly and risky game development process. It sought a license from SIE to create a *Horizon* sequel. When SIE declined, Tencent proceeded anyway. It began developing and promoting an unlicensed copycat game called *Light of Motiram*. Fans and leading trade publications were shocked and appalled when Tencent released the game's first promotional materials. For example, the popular videogame publication Kotaku reacted:

> To be clear, we're not saying, 'Oh hey, that kind of reminds of *Horizon*.' This is more of a, 'Oh my good lord, what are they *thinking* this is outrageous!' *Light of Motiram* is one of those cases where you feel safe to type the words 'complete rip-off' without worrying about a letter from someone's lawyers.

Rutowski Decl. Ex. 21. Beyond the public outrage, Tencent's infringement threatens SIE's *Horizon* Franchise development plans too.

To protect its valuable *Horizon* Franchise, business partners, and the public from Tencent's knock-off that would squelch gaming innovation, SIE seeks a preliminary injunction. Each factor favors injunctive relief: (1) SIE is highly likely to succeed on its copyright and trademark claims given the extreme similarities between protectable elements of *Horizon* and *Light of Motiram*; (2) without an injunction, SIE will incur irreparable harm to its rights as well as the goodwill of its fanbase; (3) the balance of hardships favors SIE; and (4) protecting SIE's intellectual property from Tencent's knock-off that is causing significant public confusion overwhelmingly favors the public

interest. Courts regularly grant preliminary injunctive relief in these same circumstances to protect video games and similar media from unlicensed knock-offs. *E.g.*, *Daybreak Game Co. LLC, v. Kristopher v. Takahashi*, 2025 WL 2691161, at \*1 (S.D. Cal. Sept. 19, 2025) (video game); *Interplay Ent. Corp. v. TopWare Interactive, Inc.*, 751 F. Supp. 2d 1132, 1138 (C.D. Cal. 2010) (video game); *Columbia Pictures Indus., Inc. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179, 1190 (C.D. Cal. 1998) (movie trailer). The Court should grant this motion to protect SIE, its development partners, and the public from Tencent's promotional campaign and forthcoming knock-off product.

## STATEMENT OF FACTS

### A.    SIE Invests in Developing and Launching Horizon Zero Dawn.

SIE, through its subsidiary Guerrilla Games, invested over six years and ███████ dollars creating *Horizon Zero Dawn*. Van Beek Decl. ¶ 19. *Horizon Zero Dawn* began as one of many pitches for a new game: a live-action, open-world, third-person perspective role-playing game set in a vibrant and verdant post-post-apocalyptic world. *Id.* ¶¶ 6-9. *Horizon Zero Dawn*'s creators imagined a fresh take on a post-apocalyptic world through three creative "pillars" that would be incorporated throughout the narrative, setting, sound, and feel of the game—"majestic wilderness," "awe-inspiring machines," and "tribal characters." *Id.* ¶¶ 12-15. The "majestic wilderness" pillar invokes a rich, lush natural landscape sprinkled with ruins of a collapsed civilization reclaimed by nature. *Id.* ¶ 13. The "awe-inspiring machines" pillar invokes massive terraforming robotic animals that dominate the landscape and narrative. *Id.* ¶ 14. And the "tribal" pillar invokes the surviving humans who inhabit the world in culturally distinct tribal communities. *Id.* ¶ 15. Once SIE greenlit the game, it invested in a legion of over ███████ ████████████████████████████████████████ to bring *Horizon* to life. *Id.* ¶ 19. The result was *Horizon*'s unique look, sound, and story that made it a blockbuster.

*Visual elements*. Working from the three pillars, *Horizon*'s designers created their own post-apocalyptic landscape with expressively distinct and memorable characters. *Infra* 11-12 (images of landscape). *Horizon* is set in an optimistic recovering post-post-apocalyptic world featuring lush jungles, rich forests, broad deserts, and frozen mountain ranges dotted with ruins from a lost high-tech human society. Van Beek Decl. ¶¶ 20-25. Getting the look right required "less

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-06275-JSC

obvious design choices in texture, scale, spring settings, shading, [and] shadow casting." *Id.* ¶ 25.

The landscape features 25 distinct terraforming animal-like robots called "Machines." *Id.* ¶ 29; *see also id.* ¶¶ 26-32. Inspired by dinosaurs, the Machines were a risky decision because "[p]rimitive tribes hunting high-tech machines based on an extinct species a thousand years in the future seemed illogical." *Id.* ¶ 27. Each Machine combines sleek alloy plating with animal-like joints and eye-like sensors. *Id.* ¶ 31.

The tribes are the final pillar of the visual landscape. *Id.* ¶¶ 33-36. SIE created 60–200-page style manuals for each tribe, describing the unique expression of each tribe. *Id.* ¶¶ 34. Distinctive color palettes and attire reinforce each tribe's home biome and cultural distinctiveness. For example, the Nora tribe wears primitive apparel made primarily from animal hides, leather, linen, and protective metal plates, accented with feathers, embroidery, wooden beads, and metal. *Id.* ¶ 36.

SIE also created the unique and memorable main character Aloy, who has become a recognizable icon and brand of both the *Horizon* Franchise and SIE. *Id.* ¶¶ 37-41. Aloy is a striking figure characterized by her fiery red hair and unique tribal-inspired attire blending traditional and industrial materials. *Id.* ¶ 39. Aloy is accompanied by yet another creative asset of SIE: a small, triangular, high-tech device called a "Focus" that augments reality with holographic projections to help the player identify threats and discover more about *Horizon*'s world. *Id.* ¶ 67.

***Audio elements***. *Horizon* features an award-winning original score created by world class musicians, vocalists, and composers. Van Tol Decl. ¶¶ 15-23. The score embodies and reinforces the three creative pillars to immerse the player in the overall look and feel of the game. *Id*. ¶¶ 7, 15. The "awe-inspiring machines" pillar is reflected through electronic music elements; the "tribal" pillar is reflected through percussion; and the "nature" pillar features "organic sounds." *Id.* ¶¶ 8-10. The composers spent over two years refining the score, which reflects countless unique expressive choices that "went against what people would logically expect." *Id.* ¶ 12. For example, the artists wrote the score through Aloy's eyes, making the sound intimate to "avoid 'Hollywood' sounds that are big and 'wet,' overprocessed." *Id.* ¶ 12-13. The score includes vocals by a soprano to reflect Aloy's lyrical voice. *Id.* ¶ 13. The percussive sounds in the tribal pillar are made using "bows on piano wire … and cellos are played with plectrums or the back of a bow." *Id.* ¶ 9.

3

*Narrative themes*. *Horizon*'s narrative and storyline also embody the three creative pillars. Players control Aloy as she explores the rich natural biomes that stretch across the open world map. Van Beek Decl. ¶ 74. On her journey, Aloy discovers the remnants of a lost civilization, known as the "Old Ones," and learns about its collapse. *Id.* Her "Focus" device provides information about the old civilization's ruins and the world around her. *Id.* ¶ 67. The culturally distinct primitive tribes and animalistic, robotic Machines feature heavily in *Horizon*'s narrative. The tribes each have distinct identities. *Id.* ¶ 70. For example, Aloy's tribe, the Nora tribe, is a matriarchal society, while the Tenakth tribe has an aggressive and violent warrior culture. *Id.* Likewise, the Machines have distinct identities each tied to a terraforming purpose. *Id.* ¶ 30. And *Horizon*'s narrative allows players to tame certain Machines and ride them across the landscape. *Id.* ¶ 21.

### B.    *Horizon Zero Dawn*'s Success Launches a Franchise and Spawns the Iconic ALOY Character Mark.

Upon its 2017 release for PlayStation 4, *Horizon Zero Dawn* became an instant success. Video game journalists recognized that SIE had created something extraordinary. One publication lauded *Horizon Zero Dawn* as an "artistic work[] that can scarcely be compared to anything that's come before" and "among the freshest, most moving, most topical works of science fiction." Rutowski Decl. Ex. 16 at 1, 3. IGN stated that *Horizon Zero Dawn* "leaves an indelible mark on the memory…[and] carves out a unique identity." *Id.* Ex. 11 at 1. Other publications described it as "singular and weirdly coherent," "truly new" and "genre-blending," and "a unique new aesthetic." *Id.* Exs. 12, 14, 15. Since its release, *Horizon Zero Dawn* has received many prestigious awards and accolades. *See* Van Beek Decl. ¶ 45.

Aloy, the fiery red-head main character, quickly became a fan favorite. Fans proudly show off their Aloy tattoos to the *Horizon* developers at video game conferences and even boast about naming children after her. *Id.* ¶ 40. And The Gamer named Aloy an all-time Iconic Video Game Character. Rutowski Decl. Ex. 26 at 6-7; Qizilbash Decl. ¶ 23. Aloy became the face not only of the *Horizon* games, but also of SIE. *Id.* ¶¶ 20, 25. Aloy appears in many other games and serves as the foundation for marketing for the entire platform. *Id.* ¶¶ 19-22, 25. SIE sells merchandise featuring Aloy, including action figures, plush toys, apparel, ornaments and figurines, and a variety

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-06275-JSC

1   of other items that cement the brand association in the minds of the consuming public. *Id.* ¶ 20.

2       *Horizon Zero Dawn*'s success generated an entire series of games known as the *Horizon*

3   Franchise. In 2017, SIE released a *Horizon Zero Dawn* expansion—*Horizon Zero Dawn: The*

4   *Frozen Wilds*. Van Beek Decl. ¶ 46. In 2018 SIE began work on a sequel—*Horizon Forbidden*

5   *West*. SIE invested over ▮▮▮▮▮ employees and ▮▮▮▮▮ in the project. *Id.* In 2022, SIE

6   released it to great acclaim, including multiple game of the year awards. *Id.* ¶¶ 46-47. In 2023, SIE

7   released *Horizon Forbidden West: Burning Shores* and *Horizon Call of the Mountain* (2023). *Id.*

8   ¶ 48. In 2024, SIE branched out to create *Lego Horizon Adventures*. *Id.* ¶ 49.

9       While *Horizon* has already become one of SIE's ▮▮▮▮ most valuable franchises, SIE is

10  expanding it further with the ALOY Character Mark as a prominent feature. Qizilbash Decl. ¶¶ 6-

11  18. SIE develops its franchises as "flywheels" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 7. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶ 7, 18, 29. SIE is

15  actively pursuing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮ a movie adaptation, and a ▮▮▮▮. *Id.* ¶¶ 7-18.

17       **C.**    **Tencent Seeks a License, SIE Says No, And Tencent Still Tests and Promotes**

18           ***Light of Motiram* to Massive Public Outcry.**

19      In March 2024, Tencent approached SIE executives seeking a license to create a video game

20  set in the *Horizon* universe. Tencent emphasized that its interest in *Horizon* was due to its "[h]igh

21  IP value" and "international acclaim." Courtemanche Decl. (Dkt. 63) Ex. A at 16. Tencent touted

22  that its development team at Aurora Studios included "[d]ie-hard fans" of *Horizon* who played the

23  game together at work. *Id.* at 17. In April 2024, SIE declined the pitch. *Id.* ¶ 11 & Ex. B. SIE

24  informed Tencent that while SIE "greatly appreciate[d] Aurora's level of passion and the effort

25  they put into the pitch … given where Guerrilla Games and Horizon franchise is, we don't think it

26  makes sense to pursue a Horizon universe crossover or full game development with that IP." *Id.*

27  Ex. B.

28      After SIE said no, Tencent could have done what SIE did years earlier—heavily invest in

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-06275-JSC

creating a new game. Instead, Tencent went ahead with its plan to use the *Horizon* intellectual property. It announced the upcoming release of an open-world survival game entitled *Light of Motiram* with a striking resemblance to the *Horizon* games.

Tencent released promotional materials including gameplay trailers, screenshots, and promotional images to a U.S. audience across Steam, Facebook, Instagram, X, Discord, YouTube, and Reddit. Rutowski Decl. Exs. 1.A, 7.A, 8.A, 9.A-B, 24, 25, 28A, 30-33, 46A, 47A, 60, 62, 67. The promotional materials are filled with the most distinctive and recognizable protected elements of the *Horizon* Franchise. Van Beek Decl. ¶¶ 54-69. Tencent's promotions led with an Aloy look-alike, using her image as a logo all over its social media. *Id.* ¶¶ 54, 62; Rutowski Decl., Exs. 1A, 60. Tencent's screenshots and trailers include *Horizon*'s visually unique post-apocalyptic setting, as well as look-alike animal-robot machines, look-alike tribes, and even a look-alike Focus device. *Infra* 11-13. Tencent even hired a composer of the *Horizon* score to give its game trailer the same sound as *Horizon*, down to the unique sounds for *Horizon*'s three pillars. Van Tol Decl. ¶¶ 22, 25.

The public reacted to Tencent's promotional release with derision and confusion. It quickly deemed the game a *Horizon* rip-off. One *Horizon* fan commented: "wait so it's not apart of the same universe? I just watched gameplay and thought 'looks like they've dialled it up for the sequel'. How's this even allowed to be so similar to HZD IP?" Rutowski Decl. Ex. 22 at 3 (typos in original). Another commented: "this is as blatant as a knockoff can get. I don't even think they're trying to hide that this is just a blatant knockoff." *Id.* Ex. 37.B at 1:12. Video game journalists described *Light of Motiram* as "a major *Horizon* rip-off," "an obvious knock off," a "copycat" with a main character that "resembles Aloy to a tee," and "extremely similar to *Horizon Zero Dawn*," *Id.* Exs. 18, 19, 34, 35. Kotaku concluded: "This Wild Copying of *Horizon Zero Dawn* Is Just Begging For Sony To Sue." *Id.* Ex. 21.

Because SIE, its affiliates, and Tencent are worldwide business partners, SIE attempted to resolve the matter privately. Qizilbash Decl. ¶ 38. SIE informed Tencent that the game violated its intellectual property rights. *Id.* ¶ 27. Tencent *again* requested a license, and SIE again *rejected* Tencent's request. *Id.* Tencent forged ahead over SIE's objection, releasing a new promotional trailer for *Light of Motiram* and announcing that, "[i]n the near future, *Light of Motiram* will also

commence global testing." Rutowski Decl. Ex. 8.B. at 2:32. Tencent further announced *Light of Motiram* was "Coming Soon" on the U.S.-based Epic distribution site. Rutowski Decl. Ex. 23.

### D. SIE Sues, Tencent Evades.

Ultimately, despite the business relationship and SIE's requests, Tencent proceeded to develop and promote *Light of Motiram*. The copycat game is generating significant marketplace confusion at a critical point when SIE is working to bring new audiences to *Horizon*. Qizilbash Decl. ¶¶ 28-39. As *Light of Motiram* promotional materials took root, an SIE expansion partner began to express significant concerns about Tencent's *Horizon* knock-off harming the market for new *Horizon* adaptations. *Id.* ¶¶ 29-33. *Light of Motiram* is a PC game and threatens to directly erode the market for the upcoming *Horizon* PC game currently under development. *Id.* And because PC games are easily converted into mobile-format games—both "forever" games that are constantly evolving unlike console games—*Light of Motiram* similarly threatens the *Horizon* mobile expansion under development. *Id.* ¶ 29-34; Courtemanche Decl. (Dkt. 63) Ex. B (Tencent touting its "proven PC-to-mobile experience"). SIE accordingly filed suit. SIE alleged that *Light of Motiram* infringes SIE's *Horizon* copyrights as well as its ALOY Character Mark. *See generally* Dkt. 1. After filing suit, SIE warned Tencent that it planned to seek injunctive relief and gave Tencent yet another chance to withdraw *Light of Motiram*. Rutowski Decl. Ex. 69. It has not done so.

Instead, since SIE filed suit, Tencent has obfuscated its plans for releasing *Light of Motiram* and hid behind its opaque corporate structure. After SIE sued, Tencent altered the game pages on key U.S. distribution websites of Steam and Epic Games, which had signaled a near-term release, to show a new claimed release date of Q4 2027.[1] Hurst Decl. (Dkt. 61-1) ¶¶ 2-3; Rutowski Decl. Ex. 23. SIE served the U.S. Tencent entities, which asked for a stay of the case or an extension. When SIE inquired about the game's release date in connection with the requested extensions, Defendants' counsel claimed no direct knowledge, instead pointing to public announcements.

---

[1] SIE is deeply skeptical of Tencent's alteration of the purported release date *after* SIE filed suit. SIE notes that the release date remains within the time frame of the pendency of this lawsuit, with cases in this District running at an average of at least 30 months to judgment.

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-06275-JSC

1    Rutowski Decl. Ex. 70. As soon as SIE served the parent company Tencent Holdings, Defendants'

2    counsel acknowledged that they represent Tencent Holdings, too. Hurst Decl. (Dkt. 61-1) ¶ 7. Yet,

3    despite appearing for the U.S. entities and the parent company, Defendants' counsel *still* refuses to

4    act for the other two foreign defendants. They refuse to acknowledge or waive service for the

5    foreign subsidiaries/affiliates (*id.*) and their refusal to act resulted in reassignment from a

6    Magistrate Judge to which all other parties consented (Dkt. 51).

7         As discussed in greater detail in SIE's opposition to Tencent's motion to dismiss (Dkt. 61),

8    Defendants are playing a shell game of who-did-what in a tactical effort to avoid being held

9    accountable for Tencent's infringement. The U.S.-based entities claim no involvement in *Light of*

10   *Motiram* development or marketing and no direct knowledge of release plans. Dkt. 48 at 4;

11   Rutowski Decl. Ex. 70. In light of growing market confusion about *Light of Motiram*'s connection

12   to *Horizon*, express concerns from an SIE partner about *Light of Motiram*, and Tencent's shell game

13   and obfuscation of its release plans that suggest Tencent will continue to infringe SIE's intellectual

14   property during the pendency of this lawsuit, SIE now moves for preliminary injunctive relief to

15   protect it from irreparable harm.

16                                        **ARGUMENT**

17        A preliminary injunction should issue when a plaintiff shows (1) it will likely succeed on

18   its claims; (2) it will likely suffer irreparable harm without relief, (3) the balance of equities favor

19   it; and (4) an injunction will serve the public interest. *See Winter v. Natural Res. Def. Council, Inc.*,

20   555 U.S. 7, 20 (2008); *Daybreak Game*, 2025 WL 2691161, at *1 (preliminarily enjoining

21   infringing video game). All four factors are easily satisfied here. After failing to secure a license,

22   Tencent flagrantly copied SIE's protected rights in the *Horizon* Franchise—and it did so to such an

23   extent that the public immediately decried the unmistakable and extensive plagiarism. *Infra* §I.

24   Without an injunction, SIE will suffer harm to the *Horizon* Franchise, including expansion

25   opportunities, which no monetary award can adequately compensate. *Infra* § II. Conversely,

26   enjoining further infringement will not unfairly harm Tencent, which knew of SIE's intellectual

27   property rights before deciding to disregard them. *Infra* § III. Lastly, an injunction will promote the

28   public interest by demonstrating to the market that investments in creative games will be protected

8

1    and curtailing further consumer confusion caused by the infringing *Light of Motiram*. *Infra* § IV.

2    **I.      SIE IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS.**

3          **A.      *Light of Motiram* Is a Blatant Infringement of *Horizon*.**

4          To succeed on its copyright infringement claim, SIE "must show that (1) [it] owns a valid

5    copyright" and "(2) [Tencent] copied protected aspects of [its] work." *Hanagami v. Epic Games,*

6    *Inc*., 85 F.4th 931, 940 (9th Cir. 2023). SIE can establish illicit copying by showing that Tencent

7    had access to its work and that the "works share substantial similarities." *Id.* at 941 (emphasis

8    omitted). The Ninth Circuit applies a two-part test to determine substantial similarity. The first part,

9    or "extrinsic test," "assesses the objective similarities of the two works." *Id*. The second part,

10   "intrinsic test," considers if the "total concept and feel" of the two works are "substantially similar"

11   from the perspective of an "ordinary, reasonable person." *Unicolors, Inc. v. Urb. Outfitters, Inc.*,

12   853 F.3d 980, 985 (9th Cir. 2017) (quotation omitted). "Duplication or near identity is not necessary

13   to establish infringement." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp*., 562

14   F.2d 1157, 1167 (9th Cir. 1977).

15         Here, there can be no meaningful dispute that (a) SIE possesses enforceable copyright

16   interests in the *Horizon* Franchise as the exclusive U.S. licensee, or (b) that Tencent accessed SIE's

17   works. The *Horizon* Franchise receives copyright protection as an audiovisual work, which extends

18   to a game's unique story, characters, sights, sounds, and feel. *E.g.*, *Micro Star v. Formgen Inc.*, 154

19   F.3d 1107, 1112 (9th Cir. 1998) (finding protection and likely infringement of Duke Nukem video

20   game). The U.S. Copyright Office has issued Certificates of Registration for the works at issue:

21   *Horizon Zero Dawn* on PS4 (U.S. Reg. No. PA0002516411); *Horizon Forbidden West* on PS4

22   (U.S. Reg. No. PA0002392809); and PS5 (U.S. Reg. No. PA0002391316), which establishes "a

23   prima facie valid copyright in [the *Horizon*] video game programs." *Sega Enters. Ltd. v. MAPHIA*,

24   857 F. Supp. 679, 686 (N.D. Cal. 1994); 17 U.S.C. § 410(c); Kuykendall Decl. ¶¶ 3-6 (SIE is the

25   exclusive licensee of these copyrights). Tencent repeatedly admitted that it accessed SIE's work.

26   Declaring its fandom and depicting its employees playing the game in presentations, Tencent

27   expressly asked to license the *Horizon* Franchise on multiple occasions. *See supra* 5-6. That leaves

28   only the remaining element discussed below—and the overwhelming evidence shows substantial

1    similarity under the extrinsic and intrinsic tests.

2            **1.**      *Light of Motiram* **Misappropriates Protectable Elements from** *Horizon***.**

3           Works are substantially similar under the extrinsic test when they contain objectively

4    similar expressive elements, such as "plot, theme, dialogue, mood, setting, pace, characters, and

5    sequence of events." *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287,

6    1297 (C.D. Cal. 1995). The inquiry focuses on "what is similar, not what is different, when

7    comparing two works." *Spry Fox LLC v. LOLApps Inc.*, 2012 WL 5290158, at *6 (W.D. Wash.

8    Sept. 18, 2012). Courts regularly find video games and other media substantially similar when an

9    infringer copies recognizable expressive elements to capitalize on the original's success. *See id.*

10    ("Yeti Town" and "Triple Town" substantially similar at pleading stage); *Columbia Pictures*, 11 F.

11    Supp. 2d at 1186 ("Men in Black" and "The Big One" promotional materials substantially similar;

12    granting preliminary injunction); *Krofft*, 562 F.2d at 1166-67 (H.R. Pufnstuf character and

13    McDonald's Mayor McCheese character substantially similar); *Tetris Holding, LLC v. Xio*

14    *Interactive, Inc.*, 863 F. Supp. 2d 394, 410-12 (D.N.J. 2012) (Tetris and "Mino" game substantially

15    similar; granting summary judgment); *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672

16    F.2d 607, 617–21 (7th Cir. 1982) (PAC-MAN and "gobbler" substantially similar; granting

17    preliminary injunction).

18           Tencent's copying of *Horizon* is blatant, pervasive, and specifically designed to appeal to

19    *Horizon* fans. *Light of Motiram* has objectively similar expressive elements that parrot each of

20    *Horizon*'s core creative pillars and mimic *Horizon*'s expressive facets, including its visual

21    elements, audio elements, and story and narrative elements.

22           ***Visual elements.*** The *Horizon* Franchise contains numerous distinctive and expressive

23    visual elements, including the vibrant, lush post-post-apocalyptic landscape, animal-like machines,

24    tribes, and the memorable lead character Aloy. *Supra* 2-3. SIE invested years and ███████ to

25    express each element in a unique and creative way. *Id*. Rather than doing the same, Tencent copied.

26    A comparison of each of the core visual elements of the *Horizon* Franchise with promotional

27    screenshots from *Light of Motiram* illustrates the undeniable evidence of substantial similarity.

28

Start with the overall setting of the two games. Tencent's title page mirrors *Horizon*'s featuring an Aloy-look-alike identically posed in the lower left corner overlooking the same setting featuring lush plants, snow-capped mountains, and dinosaur-like machines.

 

Van Beek Decl. ¶ 58; Rutowski Decl. Ex. 55. The substantial similarity persists throughout Tencent's promotional images. The images in the left column below show SIE's unique expression of a post-apocalyptic world. *Supra* 2-3 (discussing setting). The images on the right are from *Light of Motiram*. Tencent objectively copied nearly every aspect of *Horizon*'s expressive scenes. The images appear as if Tencent instructed its *Light of Motiram* team to: "create scenes that look like *Horizon*." As video game journalists observed "it's hard to tell if the [promotional] screenshots are from *Light of Motiram* or one of the Horizon games." *Id.* Ex. 5. at 3.

| The *Horizon* Franchise | *Light of Motiram* Promotional Material |
|---|---|
|  |  |



Van Beek Decl. ¶¶ 59-61; Rutowski Decl. Exs. 28.B at 0:30, 56, 1.B at 3:04. Moreover, Tencent even incorporated elements from *Horizon* that do not make sense outside the context of the *Horizon* story. For example, the *Horizon* setting prominently features patches of "red grass, to provide camouflage while red-haired Aloy hunts Machines." *See* Van Beek Decl. ¶ 62. *Light of Motiram*'s design features patches identical to *Horizon*'s red grass.



*Id.*; Rutowski Decl. Ex. 28.B at 1:42.

The similarities do not stop there. *Light of Motiram* also copied *Horizon*'s unique animal-robot Machines (dubbed "Mechanimals" in *Motiram*). SIE's artists painstakingly perfected their expression of the *Horizon* Machines with light gray and dark gray metal alloys, including metal armor mimicking recognizable animal musculature, glowing ocular sensors mimicking eyes and an assortment of attached components, cannisters, and cables. *Supra* 3. *Light of Motiram*'s promotional materials prominently depict "Mechanimals" that are visually expressed in a substantially similar manner to the *Horizon* Machines. Tencent chose the same animals and depicted them with similar accentuated body parts. Van Beek Decl. ¶¶ 63-65. Here are just two examples, with many more shown in the Van Beek Declaration (at ¶ 64).

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-06275-JSC

| *Horizon* Franchise | *Light of Motiram* Promotional Material |
|---|---|
|  |  |
|  |  |

Tencent also gave its Mechanimals a similar manner of movement, including how they can be ridden. *Compare Horizon*, Rutowski Decl. Ex. 65.B at: 1:06-10 (*Horizon*) *with id.* Ex. 47.B at :42-45 (*Light of Motiram*); *Hanagami*, 85 F.4th at 943-45 (requiring courts to consider character's movement); *Atari*, 672 F.2d at 618 (finding infringement of PAC-MAN character based on similar "size, shape, and manner of movement"). Again, it appears Tencent instructed its team to: "create Mechanimals that look and move like *Horizon*'s Machines."

Not content with replicating the setting and signature Machines, Tencent also copied *Horizon*'s distinctive lead character Aloy and tribal visuals. The first and third images from the left depict Aloy from *Horizon*. The interspersed *Light of Motiram* images copy Aloy's unique look to a tee, including her distinctive red hair, tribal dress, and distinctive color schemes.

| *Horizon* | *Light of Motiram* | *Horizon* | *Light of Motiram* |
|---|---|---|---|
|  |  |  |  |

1   Van Beek Decl. ¶ 66; Rutowski Decl. Exs. 60, 55.

2       ***Audio elements.*** *Light of Motiram* also contains audio elements that are objectively similar

3   to *Horizon*'s protectable content. Recall, the *Horizon* soundtrack contains several distinct features,

4   including unique scores for each of the three pillars of robots (electronic), tribes (percussive), and

5   nature (evoking beauty), and soprano vocals intended to represent Aloy's musical voice. *Supra* 3.

6   Tencent hired one of the composers of the *Horizon* score, apparently to evoke *Horizon*'s musical

7   elements. Van Tol Decl. ¶¶ 22, 25. The *Light of Motiram* announcement trailer contains the same

8   distinctive pillars of robots (electronic), tribes (percussive), and nature (evoking beauty), and also

9   features a similar female voice. *Id*. ¶¶ 24, 26.

10      Further, there are objective similarities in protected elements from the music in the trailer

11  and the "City on the Mesa" song on the *Horizon Zero Dawn* soundtrack. *See* Van Tol ¶ 26;

12  *Hanagami*, 85 F.4th at 944 (describing protectable elements). As the Principal Music Supervisor

13  overseeing the *Horizon* score explains: both "the melody is very similar" and it "is a result that one

14  can expect when giving both the Horizon main theme and City On the Mesa as reference musical

15  pieces to a composer." Van Tol ¶ 26; *see also id.* (discussing fans making similar comparisons,

16  available at https://youtu.be/NC9AciQQEe0?si=Odngflju6eKkHmff&t=430).

17      ***Story elements.*** Finally, *Light of Motiram* contains protectable story and narrative elements

18  that are objectively similar to *Horizon*. The stories follow the same narrative and have the same

19  unique take on tribal and post-apocalyptic themes. Recall in *Horizon*'s story, players explore a post-

20  apocalyptic formerly high-tech open world reclaimed by nature and inhabited by primitive tribes,

21  with distinctive views on technology, and terraforming animal-like robots. During the journey they

22  traverse diverse biomes and discover the relics of the Old Ones, which reveal, bit by bit, the truth

23  of the calamities that befell the high-tech civilization and resulted in its collapse. *Supra* 4. The

24  "About This Game" section of the *Light of Motiram* Steam Page could have been written about

25  *Horizon.* Tencent summarizes the setting and narrative of *Light of Motiram* as follows:

26      Earth and human civilization as we once knew it are gone. Across untamed wilderness,
27      giant mechanical beasts roam freely, while humanity struggles to rebuild from the dawn of
        a new primitive era. Journey from lush tropical rainforests to barren desert landscapes and
28

14

snow-capped mountain peaks—as you discover unique Mechanimals and mysterious ruins in different regions, gradually uncovering the secrets of MOTIRAM.

Rutowski Decl. Ex. 1.A at 2; *see also id.* Ex. 24 at 1 (emphasizing "mysterious mechanical creatures inhabiting the wilderness, and high-tech structures that do not belong to this era scattered throughout"). Beyond the overarching story, *Light of Motiram* copied other narrative elements. *Light of Motiram*'s "Mechanimals" share a substantially similar narrative origin and purpose to *Horizon*'s Machines—both are terraforming, animal-inspired robots. *Supra* 4; Rutowski Decl. Ex. 68 (*Light of Motiram* website). For example, the *Light of Motiram* Mechanimal modeled after a bull purportedly was designed to use its horns for "large scale land clearing operations." *Id.* Further, like *Horizon*, *Light of Motiram*'s narrative allows players to ride certain robotic animals across the open world map. *Id.* Ex. 62, at 4. *Light of Motiram*'s expression of this narrative element is substantially similar to Aloy's ability to mount and ride certain Machines. *Supra* 4.

Similarly, *Light of Motiram* copied narrative elements from *Horizon*'s tribes. Tribes are a creative pillar of the *Horizon* world, with SIE giving each tribe unique expression and identity, like the matriarchal Nora tribe and the aggressive and violent Tenkath tribe. *Supra* 4. The tribes also differ in their view of the Old Ones' lost technological knowledge. Van Beek Decl. ¶ 70. Just as in the *Horizon* narrative, the *Light of Motiram* tribes also have differing views on whether to reject or embrace lost technology. Rutowski Decl. Ex. 25. And Tencent announced that its tribes will include the "matriarchal" "Ranau" tribe (akin to the *Horizon* Franchise's Nora tribe) and the "warlike" "Dariman" tribe (akin to the *Horizon* Franchise's Tenakth tribe). *Id.*

Finally, Tencent copied the narrative Focus device. In *Horizon*, Aloy is assisted on her journey by her "Focus" device—a high-tech relic from the Old Ones' civilization that plays a critical narrative role in revealing information about the Old Ones' ruins, as well as other aspects of the players' immediate environment. Van Beek Decl. ¶¶ 67-69. Tencent included an objectively similar device called "Angelos" with an objectively similar narrative purpose. Angelos, like the Focus, is "a 'Relic' of the once-destructed advanced civilization." Rutowski Decl. Ex. 24 (*Light of Motiram* Reddit). Angelos also similarly permits the player to "communicate and interact with this world and the remnants of civilization through it" and reveals "many untold stories." *Id.*

Each objectively similar protected element Tencent copied from *Horizon* is alone sufficient to establish substantial similarity under the extrinsic test, but in addition the "totality of the similarities between the two [works] … belies any claim of literary accident." *Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir. 1990). SIE is thus very likely to show substantial similarity under the extrinsic test.

  **2.**  **Industry Commentary Confirms Ordinary Observers View *Light of Motiram*'s Concept and Feel as Substantially Similar to *Horizon*'s.**

SIE also has an overwhelming likelihood of establishing substantial similarity under the intrinsic test, which asks whether an ordinary reasonable observer would consider the "total concept and feel" of the two works "substantially similar." *Unicolors*, 853 F.3d at 985-87. Here, the *Light of Motiram* promotional materials establish that the two games have a substantially similar "concept and feel" from the visual setting to the musical score to the story and narrative. *Supra* 10-15 (discussing similarities). Any *Horizon* fan would immediately think of *Horizon* when seeing *Light of Motiram*. *See Metro-Goldwyn-Mayer*, 900 F. Supp. at 1299 (granting injunction after considering likely success in proving substantial similarity under intrinsic tests); *Columbia Pictures*, 11 F. Supp. 2d at 1185 (same).

Indeed, numerous reasonable observers *have already concluded* that the look and feel of the two games is substantially similar. *See* S*pry Fox*, 2012 WL 5290158, at *7 (relying on "reports of video game bloggers"). Journalists described *Light of Motiram* as "a major *Horizon* rip-off," "an obvious knock off," a "copy cat" and "extremely similar to *Horizon Zero Dawn*." *Supra* 6. Other publications commented that "the developers of *Light of Motiram* borrowed the visual style from the Sony [*Horizon*] series to such an extent that if someone told me this is a spin-off of that brand, I would easily believe them." Rutowski Decl. Ex. 4. Ordinary video game players also recognized the identical look and feel. Visitors to *Light of Motiram*'s own Steam page made similar observations. One commented: "No way you think it's OK to copy Horizon this much ><". *Id*. Ex. 7.A at 1. Another added: "Not only does it look like a copy of the horizon games, but you had the cheek to copy the cover art aswell [sic]." *Id.* at 2. *Light of Motiram* blatantly misappropriated the overall look and feel of the *Horizon* Franchise.

**B.**    *Light of Motiram*'s **Redhead Female Icon Infringes the ALOY Character Mark.**

SIE will also likely prevail on its Lanham Act and California trademark claims. To do so, SIE must show that (1) it holds a protectable mark, and (2) Tencent's imitating mark is likely to cause consumer confusion. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014). SIE holds a highly distinctive and strong ALOY Character Mark. *Infra* § I.B.1. Tencent infringed this mark when it deliberately deployed an Aloy look-alike in order to exploit *Horizon*'s goodwill and attract *Horizon* fans to its competing knock-off. *Infra* § I.B.2. The cornerstone of trademark infringement is protecting consumers against the actual confusion here.

**1.    The ALOY Character Mark Is Highly Distinctive and Strong.**

"For over a century, trademark and unfair competition law has protected the names and appearance of characters." McCarthy on Trademarks and Unfair Competition § 4.2 (5th ed.) (May 2025 update). "[I]ngredients" of "entertainment characters" that are protectable under trademark law include their "physical appearances and costumes." *DC Comics, Inc. v. Filmation Assocs.*, 486 F. Supp. 1273, 1277 (S.D.N.Y. 1980); *see Universal City Studios, Inc. v. J.A.R. Sales, Inc.*, 1982 WL 1279, at *4, 9 (C.D. Cal. Oct. 20, 1982) (finding "physical appearance of the character 'E.T.'" protectable trademark and granting injunction); *cf. DC Comics v. Towle*, 802 F.3d 1012, 1020 (9th Cir. 2015) (recognizing Batmobile character may be "distinctive … even if the character does not maintain the same physical appearance in every context" in analyzing copyright; also finding willful trademark infringement of the Batmobile). A trademark receives strong protection if it is inherently distinctive or has strong marketplace recognition. *See Pom Wonderful*, 775 F.3d at 1126; 1 McCarthy on Trademarks and Unfair Competition § 10:43 (5th ed.) ("[I]f the character fits within the category of inherently distinctive marks, there is no need to prove secondary meaning.").

Aloy—with her "notoriety" and "highly original appearance"—qualifies as a protectable character mark, and a "strong" one at that. *Universal City Studios*, 1982 WL 1279, at *4. Aloy has a distinctive look. As depicted and discussed (at 3,13), she is a young and fierce tribal warrior-huntress characterized by fiery red hair, high cheekbones, and outfits that blend tribal and industrial metallic elements. Van Beek Decl. ¶ 39. Aloy's look is unrelated to any utilitarian aspect of *Horizon*'s product and operates purely as a source-identifying emblem to distinguish *Horizon*

games from other videogame products, which entitles it to strong protection. *See Pom Wonderful*, 775 F.3d at 1126.        Further, the marketplace has recognized the ALOY Character Mark as distinctive. *See id*. Aloy has been recognized as an all-time best video game character. *See supra* 4. Commentators describe Aloy as a marquee PlayStation mascot and consider it "synonymous with Sony." Rutowski Decl. 29. And video game fan communities consistently recognize her image as emblematic of *Horizon*. Qizilbash Decl. ¶¶ 19, 24; Van Beek Decl. ¶ 41. That is because since *Horizon Zero Dawn*'s debut in February 2017, SIE has consistently used the ALOY Character Mark in commerce as a source-identifier for *Horizon* and SIE goods and services. *Id.* Aloy's visage has consistently appeared on *Horizon* video-game packaging, digital storefront banners, official PlayStation website headers, social-media avatars across Facebook, Instagram, X, Discord, YouTube, and Reddit, trailer thumbnails, licensed merchandise such as collectible statues, limited-edition apparel, museum-quality art prints, and other promotional materials—cementing the association of the ALOY Character Mark's distinctive look with the *Horizon* and SIE brands. Qizilbash Decl. ¶¶ 19-25. Indeed, Aloy is so well known that other game makers license the right to use her character in other popular games, like Fortnite. *Id.* ¶ 22.

### 2.    Tencent's Deliberate Use of an Aloy Clone Causes Actual Confusion.

Tencent's blatant exploitation of the ALOY Character Mark to promote its knockoff competing game is also not merely likely to confuse consumers, it already has. To determine whether a reasonable likelihood of confusion exists, courts consider the *Sleekcraft* factors: (1) strength of the protected mark; (2) proximity and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). While each factor points towards confusion here, a party need not prevail on every factor to establish a likelihood of confusion. For instance, when "virtual[ly] identit[ical] … marks … [are] used with identical products or services likelihood of confusion … follow[s] as a matter of course." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999). That is the case here.

Tencent used virtually identical images of the ALOY Character Mark to promote an identical product—a competing video game—and it did so in the same marketing channels used by *Horizon*—e.g., Steam, Facebook, Instagram, X, Discord, YouTube, and Reddit. *See, e.g.*, Rutowski Decl. Exs. 1.A, 8.A, 9.B, 60, 62 (marketing channels). The following images are just two examples (from Steam and Facebook) of numerous instances in which Tencent featured its Aloy lookalike as a product-promoting logo:



*Id.*; Exs. 1.A, 67; *see also* 8.A, 9.A, 24, 25, 60. Each features the copy-cat ALOY Character Mark as a profile logo with red hair, tribal-inspired attire, and at times a blue-glowing earpiece that unmistakably echoes Aloy. *Id.* Tencent also released promotional branding with the look-alike posed nearly identically to Aloy in *Horizon* branding. *See supra* 11, 13. Tencent's use of a substantially similar character mark to promote a substantially similar game is overwhelmingly likely to confuse.

Indeed, there is evidence that Tencent's misappropriation has already led to actual confusion which "is persuasive proof that future confusion is likely." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000). As discussed (at 6-7), commentary on various websites and social platforms shows actual and extensive confusion as to whether *Light of Motiram* is affiliated with *Horizon*. One post expressed such confusion this way: "OMG!!! Finally, Sony are releasing Horizon 3 and its free to play!!!... wait a minute…. This isn't sony… guys help I think I clicked on the wrong game!!" Rutowski Decl. Ex. 7.A; *see also id.* Ex. 22 at 3. That a consumer may subsequently detect the ruse makes no difference. "[T]he diversion of consumers' initial interest is a form of confusion against which the Lanham Act protects." *Brookfield*, 174 F.3d at 1063.

Finally, when a company "knowingly adopts a mark similar to another's, … courts presume that the defendant can accomplish [its] purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354; *see also Brookfield Commn's*, 174 F.3d at 1059 ("This factor favors the plaintiff where the alleged infringer adopted [its] mark with knowledge, actual or constructive, that it was another's trademark."). Here, that principle applies in spades because Tencent *expressly told* SIE that it wanted to release a new game using SIE's *Horizon* intellectual property. *Supra* 5. Tencent's marketing and promotional strategy confirms that it is doing exactly what it told SIE it planned to do—using Aloy to promote Tencent's game—and reflects a deliberate infringement of the ALOY Character Mark. *See* Courtemanche Decl. (Dkt. 63) Ex. A, at 24 (Tencent pitch discussing "character image licensing" and option for "licensing Aloy as a new NPC").

## II.    SIE IS LIKELY TO SUFFER IRREPARABLE HARM.

Absent an injunction, Tencent's ongoing copyright and trademark infringement will cause SIE irreparable harm during this lawsuit. SIE's harm falls into two categories that courts routinely find irreparable in both copyright and trademark cases—(A) harm in the form of loss of control of intellectual property rights, which here include expansion and licensing opportunities for *Horizon*, and (B) harm to its fanbase, goodwill, and reputation. *See Daybreak Game*, 2025 WL 2691161, at*12 (copyright: "irreparable harm stemming from the infringement (e.g., loss of market share, reputational harm)," and loss of "right to control the use of his/her copyrighted material"); *Boldface Licensing %8F Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1196 (C.D. Cal. 2013) (trademark: "los[s of] business opportunities, customers, and goodwill" irreparable). "In run-of-the-mill copyright litigation, … proof of such harm stemming from infringement … should not be difficult to establish." *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 948 (N.D. Cal. 2009). And on the Lanham Act claim, SIE is entitled to a statutory "rebuttable presumption of irreparable harm … upon a finding of likelihood of success." 15 U.S.C § 1116(a).

### A.    Tencent's Infringement Interferes with SIE's Creative Control and Jeopardizes Licensing and Expansion Plans.

SIE's *Horizon* copyrights and ALOY Character Mark give it exclusive creative control over whether and how to expand the *Horizon* Franchise. *See Metro-Goldwyn-Mayer Studios, Inc. v.*

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-06275-JSC

*Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217–18 (C.D. Cal. 2007). Tencent's unauthorized *Horizon* copycat compromises SIE's right "not to license [its] property," which can only be protected with injunctive relief. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028–29 (9th Cir. 2001).

SIE will also suffer irreparable harm to specific expansion plans. *See Universal City Studios*, 1982 WL 1279, at *5 (finding irreparable harm when "Universal will be hurt in its efforts to produce and distribute future motion pictures"); *Universal City Studios, Inc. v. Film Ventures Intl., Inc.*, 543 F. Supp. 1134, 1139 (C.D. Cal. 1982) (finding irreparable harm when "the commercial exploitation of 'Jaws' and 'Jaws 2' through theatrical rerelease, television, and video cassettes will be diminished"). As the SIE Senior Vice President who directs franchise development explained, SIE is at a "critical point in the *Horizon* franchise's expansion" ███████████████ ███████████████████████████████████████████████████████████████ ████████████ Qizilbash Decl. ¶¶ 5, 7, 18, 29; *supra* 5 (discussing expansion strategy). But a "copycat game [will] upset the already delicate balance." *Id.* ¶ 18. Tencent's promotion, and forthcoming release, of a competing game causes irreparable harm by "undermin[ing]" SIE's negotiating position for new markets and "damage[ing] goodwill with licensees" by threatening to reduce the value of those new markets. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 865 (9th Cir. 2017); *see Interplay*, 751 F. Supp. 2d at 1138 (finding irreparable harm on trademark claim when "Interplay has a new version of its Battle Chess game that it expects to release sometime next year and this litigation is unlikely to be resolved before then"); Qizilbash Decl. ¶¶ 27-40.

Critically, an ████████████████████████████████████████████████ ███████████████████████████████ *See VidAngel*, 869 F.3d at 865-66 (finding irreparable harm when "licensees rais[ed] concerns" about the infringing work). Preliminary injunctive relief is imperative to ensure SIE's valuable relationships are not harmed during the pendency of these proceedings. ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Qizilbash Decl. ¶¶ 29-33. ████████████████████████████████████████████ *Id.* ¶ 33. ████ ████████████████████████████████████████████████████████ *Id.*

¶ 15. Any further dilution of the ALOY Character Mark threatens the value of the Aloy brand, SIE's creative control over its copyrights, and these expansion opportunities. *Id.* ¶¶ 26, 35-40. And all of these harms are occurring now, based on Tencent's promotional campaign, irrespective of the precise timing of *Light of Motiram*'s release. The threat of irreparable harm during the pendency of this action absent an injunction is thus clear and imminent.

### B.    SIE Will Suffer Unquantifiable Losses to Goodwill and Reputation.

Tencent's infringement has and will also continue to irreparably harm SIE's goodwill and reputation by usurping creative control over the Franchise from SIE and misleadingly and wrongly associating *Light of Motiram* with the *Horizon* Franchise in consumers' minds. This false association, which Tencent deliberately fostered, causes multiple unquantifiable harms. SIE has spent more than a decade carefully cultivating the *Horizon* Franchise to maintain its reputation as a high-quality video game and popular brand. Qizilbash Decl. ¶¶ 6, 10 19, 27. Any unauthorized use of the *Horizon* copyrights and the ALOY trademark in, or to promote, a competing product creates an untenable and unquantifiable risk of "negative consumer reaction" associated with the *Horizon* Franchise that "will undoubtedly cause irreparable harm to the public image of [*Horizon*]." *Interplay Ent.*, 751 F. Supp. 2d at 1138 (trademark); *see Sega Enters.*, 857 F. Supp. at 689 (finding irreparable harm in copyright case from possible harm to business and reputation from distribution of altered, inferior copies of Sega games); Qizilbash Decl. ¶¶ 36-40 (explaining SIE cannot quantify such losses). SIE will also lose its right to control how, if at all, its copyrighted expression is used. *See Metro-Goldwyn-Mayer*, 518 F. Supp. 2d at 1217–18.

Further, without an injunction, Tencent will continue to compromise the distinctiveness of the ALOY Character Mark in unquantifiable ways (which is why Congress mandated a presumption of irreparable harm). Tencent risks destroying a carefully curated set of associations, creating an untenable risk that fans seeing the ALOY Character Mark are less likely to immediately think of SIE/*Horizon*; they now may think of *Light of Motiram*.

It makes no difference to the harm analysis that Tencent has replaced some of its original promotional materials. Compl. ¶ 123. Tencent has already generated widespread attention and interest in *Light of Motiram* as a *Horizon* knock-off through its promotional campaign. Because

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-cv-06275-JSC

Tencent has already created the association and hype about *Light of Motiram* as a *Horizon* substitute, any continued promotion, even with noninfringing material, threatens the same irreparable harm to SIE's licensing and goodwill by communicating to the market that Tencent's competing copycat game remains forthcoming. *See Brookfield*, 174 F.3d at 1063 (initial interest confusion); *cf. Hidden Empire Holdings, LLC v. Angelone*, 2022 WL 17080131, at *13 (C.D. Cal. Sept. 30, 2022) ("Defendants' public promotion of the video game through their website, social media, and press releases, undeniably has and will continue to undermine Plaintiffs' right to first publication.").

## III.    THE BALANCE OF HARDSHIPS FAVORS SIE.

The balance of hardships also tips in SIE's favor. SIE is likely to suffer the aforementioned unquantifiable harms, including loss of fanbase and interference with ongoing business opportunities, to one of its ███ most valuable franchises at a pivotal point in the *Horizon* Franchise's expansion. Conversely, Tencent will suffer no cognizable harm. Any harm to Tencent from ceasing its infringement "does not merit significant equitable protection," *VidAngel*, 869 F.3d at 867, as it "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities," *Triad Sys. Corp. v. Se. Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995). As a willful infringer that "deliberately proceeded" with developing and marketing *Light of Motiram* despite SIE's warnings, Tencent "cannot now be heard to complain that it will be … injured" by an injunction. *Helene Curtis Indus. v. Church & Dwight Co.*, 560 F.2d 1325, 1333-1334 (7th Cir. 1977). SIE's "proposed injunction merely prohibits [Tencent] from engaging in activities it was never entitled to carry out in the first place." *Niantic, Inc., v. Global ++, et al.*, 2019 WL 8333451, at *9 (N.D. Cal Sept. 26, 2019) (granting preliminary injunction).

## IV.    A PRELIMINARY INJUNCTION WILL PROTECT THE PUBLIC INTEREST.

Finally, a preliminary injunction will protect the public interest in guarding intellectual property rights, avoiding marketplace confusion, and safeguarding companies' significant investments in high-quality video games like *Horizon*. *See VidAngel*, 869 F.3d at 867 (holding "public has a compelling interest in protecting copyright owners' marketable rights" and "economic incentive to continue creating television programming"); *Waymo LLC v. Uber Techs., Inc.*, 2017

WL 2123560, at *11 (N.D. Cal. May 15, 2017) (holding "public has an interest in vindicating intellectual property rights, and in prohibiting unfair competition"); *Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1275 (9th Cir. 1982) ("consuming public is equally injured by an inadequate judicial response to trademark infringement"). If Tencent is free to knock off a successful franchise, the public will be severely harmed as original content creators lose the incentive to invest the resources necessary to make the next blockbuster franchise. *See* Qizilbash Decl. ¶ 39 (discussing incentives); *supra* 2 (discussing SIE's massive investments). Tencent can claim no public interest in promoting a game using misleading and infringing materials that usurps the market for *Horizon* products, confusing the public into believing *Light of Motiram* is part of the *Horizon* Franchise or a *Horizon* substitute.

In any event, the public has already spoken here. Journalists, fans, and consumers are offended by Tencent's *Horizon* rip-off and it has generated confusion in the marketplace. *Supra* 18-19 (discussing confusion). The well-recognized public interest in vindicating intellectual property rights and preserving incentives for creating new works supports an injunction here.

## V. THE COURT SHOULD NOT REQUIRE A BOND.

"The district court is afforded wide discretion in setting the amount of the bond, ... and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (internal citations omitted). The Court should require no bond here because there is no cost to or burden on Tencent to comply. Tencent need not pull any released video game from the market; it need only cease its infringing activities and refrain from releasing an infringing product.

## CONCLUSION

The Court should grant SIE's motion for preliminary injunction, enjoining Tencent from reproducing, preparing derivative works of, displaying, performing, and distributing any works copied or derived from SIE's *Horizon* Works, including *Light of Motiram*, and from using the ALOY Character Mark or any confusingly similar mark pending trial.

1

Dated: October 16, 2025

2

Respectfully submitted,

3

ORRICK, HERRINGTON & SUTCLIFFE LLP

4

By: /s/ *Annette L. Hurst*

5

ANNETTE L. HURST
Attorneys for Plaintiff
Sony Interactive Entertainment LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-06275-JSC